**UNITED STATES of America, Appellee,**

v.

**Orlando Delli PAOLI, Richard Warme, and Victor Isaza, Appellants.**

**Nos. 647–649, Dockets 78–1395 to 78–1397.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1979.

Decided June 26, 1979.

Roy Broudny and Laurence Jeffrey Weingard, Weingard & Broudny, New York City, for appellants Orlando Delli Paoli and Richard Warme.

Stuart Holtzman, New York City, for appellant Victor Isaza.

Thomas H. Sear, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, of counsel), for appellee.

Before LUMBARD and OAKES, Circuit Judges, and BRIEANT, District Judge.*

LUMBARD, Circuit Judge:

Orlando Delli Paoli, Richard Warme, and Victor Isaza appeal from judgments of conviction entered September 27, 1978, October 6, 1978, and October 12, 1978, respectively, after a three-week jury trial before Judge Gerard L. Goettel in the Southern District of New York on an indictment charging distribution of cocaine and conspiracy to distribute heroin and cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846. On appeal, appellants contend that the government's proof at trial established multiple conspiracies, and that each appellant was seriously prejudiced by the proof of other conspiracies in which he was not involved. Appellants also contend that the district court made several erroneous evidentiary rulings. Finding appellants' claims to be without merit, we affirm.

The central question on appeal is whether the jury could find that the evidence supported the charge of a single conspiracy. From an examination of the record, we conclude that the evidence showed that over a period of several weeks in early 1978, the defendants were acting together and knew they were acting together to distribute heroin and cocaine. The mastermind was Richard Warme, who sought to obtain for resale a steady supply of heroin and cocaine from a number of suppliers. Warme obtained quantities of cocaine from a partnership composed of defendants Isaza and Wayne Petrucha for resale to New York narcotics agents.[1] The proof also showed that Warme advanced $20,000 to defendant Delli Paoli for ½ pound of heroin, $20,000 which later disappeared into the pocket of a trusted confederate who absconded to parts unknown without delivering the heroin. Most of the important

---

* Of the Southern District of New York, sitting by designation.

1. Warme also purchased narcotics from defendant Robert Bolella, who pled guilty prior to trial and who was sentenced to 312 days imprisonment and five years special parole. Defendant Petrucha also pled guilty prior to trial and was sentenced to one year and a day imprisonment and five years special parole.

After their convictions at trial, defendant Delli Paoli was sentenced to two years imprisonment and three years special parole, defendant Warme was sentenced to four seven-year concurrent sentences and ten years special parole, and defendant Isaza was sentenced to an indeterminate term of imprisonment to be followed by three years special parole. Diane Warme, wife of defendant Richard Warme, was also charged with conspiracy but was acquitted after trial.

activity took place at three places in the Bronx: at Warme's residence, at a furniture store owned by Warme's mother-in-law, and at the Andrea Motel which was owned by the family of Delli Paoli.

On January 24, 1978, Detective Steven Caracappa of the New York Drug Enforcement Task Force went to an apartment in the Bronx. There a woman named Lorraine introduced Caracappa to Warme. Warme offered to sell Caracappa two kilograms of cocaine. Caracappa agreed. The following day, Warme again met with Caracappa at the same apartment, provided him with a sample of cocaine, and promised to provide him with heroin.

Warme was not able to deliver any drugs at that time. Caracappa, however, maintained contact with Warme who repeatedly promised that he would shortly have both heroin and cocaine. Thus on February 2, 1978, Warme explained in one of many tape-recorded conversations that he had not been able to supply the promised narcotics because a confederate had not done the "right thing on the other end." When Caracappa replied that he did not want to pressure Warme, Warme indicated that he wanted to go through with the deal but that he would have to "go there myself." Later, on February 14, 1978, when Warme indicated that there were still supply problems, Caracappa replied, "If there's a problem, you know I rather like back away from the thing. . . . if you don't want to do it, I don't want to push it." In later conversations, Warme continued to urge Caracappa to be patient because he expected to solve his supply problems shortly.

Finally, on the evening of February 21, 1978, Warme took Caracappa to the Twilight Lounge in the Bronx. There Warme introduced Caracappa to defendant Robert Bolella, whom Warme said was the man responsible for "hanging him up" on the deal. Although Bolella had already committed his heroin to someone else, he agreed to sell four ounces of cocaine to Caracappa.

On February 25, Warme, Bolella, and Caracappa met at Warme's house. Caracappa then drove Bolella to the home of Bolella's "connection" in Scarsdale to pick up one ounce of cocaine for $1,000. When Caracappa returned to Warme's house with Bolella, Caracappa paid Bolella for his help an additional $200, $100 of which Bolella paid to Warme.

On March 2, 1978, Delli Paoli met Warme at a furniture store belonging to Warme's mother-in-law, located at 3434 Tremont Avenue in the Bronx. After Delli Paoli left, Caracappa arrived. Thereafter, defendant Wayne Petrucha arrived with a sample of cocaine, which he gave to Warme and which Warme then gave to Caracappa. After receiving the sample, Caracappa agreed to purchase through Warme three or four ounces of cocaine at $1,400 per ounce later that night. Caracappa gave Warme $1,200 "front" money toward the purchase price and Warme turned the money over to Petrucha. That afternoon, defendant Bolella also visited the furniture store where he and Warme discussed with Caracappa a sale of heroin and additional amounts of cocaine. That evening, Caracappa, Warme, and Petrucha met again at the furniture store. Petrucha sold to Caracappa five ounces of cocaine for a total price of $7,000. Caracappa paid Warme $50 for his help.

On the evening of March 9, 1978, Caracappa, accompanied by undercover officer William Petraglia, drove with Warme to Warme's apartment at 1101 Throgs Neck Boulevard in the Bronx. Shortly after their arrival, defendant Wayne Petrucha came to the apartment, accompanied by defendant Victor Isaza. Petrucha told Caracappa that Isaza was "the connection." Caracappa then purchased from Petrucha and Isaza five more ounces of cocaine, this time at $1,200 per ounce. Isaza said that this cocaine was the same material Caracappa had purchased March 2, and that he and Petrucha could obtain for Caracappa large quantities of both heroin and cocaine. After Petrucha and Isaza left, Caracappa paid Warme $400 for his "cut on the deal."

On March 14, 1978, Warme, Caracappa, and Petraglia met again at the Crosstown Diner in the Bronx. There Warme told Caracappa and Petraglia that he had a her-

oin connection (Delli Paoli) who was associated with "Fat" Tony Salerno and the "Pleasant Avenue People", and that he would soon be able to provide seven ounces of white heroin for $11,000.

On March 16, 1978, Warme met Caracappa and Petraglia at the furniture store to discuss further the proposed heroin deal. His connection, he said, had just completed a $50,000 heroin deal. Later that night, Warme met with Caracappa and Petraglia at Damien's Bar in the Bronx. Delli Paoli arrived for a brief visit, during which time he looked at but did not speak with Caracappa. After Delli Paoli left, Warme informed the officers that the heroin deal had fallen through. Warme then assured them that he would have heroin available on Sunday, March 19, 1978.

On March 19, 1978, Caracappa and Petraglia travelled to the furniture store owned by Warme's mother-in-law. The officers gave Warme $11,000 front money for the seven ounces of heroin which he promised would arrive that evening. Warme then drove to the Andrea Motel in the Bronx, which was owned by Delli Paoli's family. After meeting with Delli Paoli, Warme returned to the officers and reported that the heroin had not yet arrived. He told them to meet him at the Colonial Inn in the Bronx. Bolella later picked up the officers at the Colonial Inn and brought them to Caesar's Restaurant in the Bronx, where he received a call from Warme reporting that the heroin had still not arrived.

Warme met with the undercover officers during the early morning hours of March 21, 1978 at his apartment. Warme returned $9,000 to the officers and explained that he had left $2,000 with his connection as a binder on the heroin which had still not arrived. Later that day, Warme asked for $9,000 back so that he could pay for the heroin, which he expected momentarily. Caracappa refused, telling Warme that he would have to receive something for his $2,000 before he advanced any more money.

On March 23, 1978, Warme again met with the undercover officers at the furniture store. After Warme explained his con-

nection's pricing policies, Caracappa and Petraglia agreed to pay $20,000 "up front" and $15,000 after delivery for a ½ pound of heroin, which Warme expected to receive over the weekend. Warme then left to see his "man"—Delli Paoli.

On the morning of March 27, 1978, Warme called Caracappa and told him that the heroin had arrived. Petraglia put the $20,000 package of money together while Caracappa drove to the furniture store. Later that day, Warme took the two undercover officers to a restaurant near the Andrea Motel. Warme then drove over to the Andrea Motel with the $20,000. After he arrived at the motel, he was observed conferring with Delli Paoli. Later in the afternoon, Warme once again assured the officers that the heroin would arrive momentarily. He then drove back to the motel for further discussions with Delli Paoli. After a further delay, Warme's wife Diane Warme finally responded to the officers' impatience by escorting Caracappa and Petraglia to a room at the motel where the officers met Delli Paoli for the first time. Delli Paoli explained to the officers that there was "a little problem." According to Delli Paoli, he had given the $20,000 to an old friend of his, Sam Schifano, whom he had known for 25 years. Schifano had taken the $20,000 to buy the heroin and had disappeared. Delli Paoli said that he had told Warme to search for Schifano. He then told the officers to meet him at Warme's house in an hour.

The undercover officers met with Delli Paoli at Warme's house during the early morning hours of March 28, 1978. Delli Paoli informed the officers that it looked like the money was gone for good. Delli Paoli then indicated that he would pay the money back with interest either with cash payments or with payments of drugs.

The officers met with Warme at his apartment on the afternoon of March 28. Warme said that he had been up all night looking for Schifano and that he would try to make up the loss with eight ounces of cocaine. Delli Paoli then arrived and said that he had other people looking for Schifa-

no as well. He confirmed Warme's promises that they would pay the officers back with drugs.

On March 29, Caracappa and Warme discussed Warme's efforts to get what cocaine he could to make up the $20,000. Warme was relying heavily upon Petrucha. That night, Warme met Caracappa and Petraglia outside Warme's residence, told them to wait, and went to the furniture store where Petrucha was waiting with a package of cocaine. Warme took the cocaine from Petrucha and stepped into the back of the store, purportedly to get the money to pay Petrucha. In fact, Warme never had any intention of paying Petrucha. He continued out the back door and jumped over a fence. Bolella picked him up in his car and they drove past the undercover officers, signaling for them to follow. Bolella and Warme stopped near the Bartow exit on the New England Thruway and there gave the officers five ounces of cocaine. Later that night, Caracappa called Delli Paoli to tell him that the five ounces of cocaine only partially compensated him for the lost $20,000. Delli Paoli replied that he would try to make up the difference with heroin.

On March 30, Caracappa spoke several times with Warme and Petrucha. In one conversation, Petrucha specifically identified Isaza as a major participant in his cocaine dealing. That night, the undercover officers met with Warme at the Andrea Motel. Warme emphasized that Delli Paoli was at least as responsible as he was for the $20,000 loss, since Schifano was his friend and had put his "blessing" on the deal. Warme also gave the officers another ounce of heavily cut cocaine. Later, Warme gave them an additional four ounces of this low-quality cocaine. Although Warme said that he received this cocaine from a new source, the available evidence strongly suggests that he merely took the five ounces of cocaine stolen from Petrucha and added enough quinine to make it into ten ounces.

The following day, March 31, Warme and Delli Paoli were again observed and photographed together outside the Andrea Motel just before their arrest brought the conspiracy to a close.

## THE DEFENSE

The only defendants who testified were Diane Warme and Delli Paoli. Delli Paoli testified that he had known Warme since 1976, and that Warme had come to him on March 27 because he needed Delli Paoli's help. Warme told Delli Paoli that he "was in some kind of a problem, serious trouble." Delli Paoli said that Warme refused to tell him what the problem was. Delli Paoli further testified that he spoke to the undercover officers later that night on Warme's behalf. Delli Paoli testified that he did not know what the officers were talking about when they mentioned the drug deal, and that his conversations with Warme outside the Andrea Motel concerned construction problems and not narcotics.

## A SINGLE CONSPIRACY

Defendants claim that the government's proof at trial established multiple conspiracies, and that each defendant was seriously prejudiced by the proof of other conspiracies in which he was not involved. Defendant Isaza also argues that his single sale of cocaine on March 9, 1978 was insufficient to support a conspiracy conviction.

■ The government charged a conspiracy to distribute narcotics beginning in January, 1978, and continuing until the time when the various defendants were arrested. From the proof at trial, the jury could have found the existence of an ongoing narcotics business run by Richard Warme, who was the core participant and who brokered sales of cocaine by defendants Delli Paoli, Isaza and Petrucha. Each of the defendants knew of Warme's general plan and of the role each played in the attempt to bring that plan to fruition. We believe that there was sufficient evidence to permit the jury to find the single conspiracy charged in the indictment.

The proof at trial showed that these defendants became acquainted with Warme's plan and his strategy for carrying it out by March 2, 1978, at the latest. On that day, Delli Paoli, Warme's vaunted "connection", visited Warme at the furniture store be-

longing to Warme's mother-in-law. The jury could infer that Delli Paoli did not travel to the furniture store on any legitimate business, but that he visited Warme to discuss their narcotics dealings.

Soon after Delli Paoli left the furniture store, Caracappa and then Petrucha arrived. That night, Petrucha returned to the furniture store and delivered to Caracappa five ounces of cocaine for $5,000. On March 9, 1978, Petrucha identified Isaza to Caracappa as his "connection." Instead of objecting, Isaza confirmed his relationship with Petrucha and his covert involvement in the March 2 deal by telling Caracappa that the cocaine delivered on March 9 was the same material as the March 2 cocaine, and that he and Petrucha could obtain plenty more. Accordingly, the jury could infer that Isaza and Petrucha worked together, that Isaza participated in the March 2 transaction, and that both Petrucha and Isaza were members of the conspiracy as of that time.

■ Having become integral parts of Warme's supply network as early as March 2, defendants Delli Paoli, Petrucha, and Isaza inevitably came to know that they were not the only suppliers. When Warme discussed with them his plan to sell large amounts of narcotics to the undercover officers, the other defendants must have known that he would obtain narcotics wherever he could. Thus Delli Paoli, Petrucha, and Isaza knew that whenever they could not meet Warme's needs, he would try to fill them elsewhere. In addition, when Warme and Delli Paoli planned partially to compensate Caracappa by stealing cocaine from Petrucha, Delli Paoli planned to smooth things over by talking to Petrucha's father. Thus the jury could infer that Delli Paoli knew Petrucha and probably Isaza as well. Where co-conspirators know with certainty that other suppliers and dealers exist, even if they are not known personally, this court has recognized the existence of a single conspiracy. *See, e. g., United States v. Moten*, 564 F.2d 620 (2d Cir. 1977) (narcotics conspiracy involving numerous defendants in Florida, New York, Washington, D.C., and Illinois); *United States v. Taylor*, 562 F.2d 1345 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977) (narcotics conspiracy involving numerous defendants in New York and Washington, D.C.).

The cases appellants rely upon are distinguishable. In *United States v. Miley*, 513 F.2d 1191 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975), a former drug dealer cooperating with the government in the hopes of receiving some clemency led the agents on drug buying trips which involved several sellers. None of the sellers had any reason to be aware of the other sellers. In *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975), a core group of narcotics traffickers engaged in four separate drug transactions whereby they either stole drugs without paying for them, or failed to deliver drugs for which they had received payment in cash. In each transaction they employed confederates hired for that transaction alone, confederates who had no reason to know that the core group had engaged in similar thefts elsewhere. Finally, in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 420 (1946), only one of the alleged conspirators, the core or "hub" conspirator, had any knowledge of the existence and identity of other "spoke" conspirators, or had reason to know of their existence and identity.

THE $50,000 HEROIN DEAL

■ Warme and Delli Paoli claim as error admission of Warme's statement to Caracappa and Petraglia that his "connection", Delli Paoli, "was very, very careful because he had just completed a $50,000 heroin deal in Miami, Florida." Both Delli Paoli and Warme contend that this testimony was inadmissible as mere "other crimes" evidence. Delli Paoli further argues that as to him this statement was an inadmissible hearsay declaration by Warme. We find that this statement was made in furtherance of the conspiracy and was direct evidence of the existence of the conspiracy. The statement was therefore admissible against all the co-conspirators, including Delli Paoli.

In admitting this testimony, the district court observed that no heroin had actually passed during the course of the conspiracy and that the government was therefore obligated to prove that "these were earnest negotiations by people who had the capability of delivering the heroin". Warme's statement that his connection had just completed a $50,000 heroin deal was admissible not only to prove capability and intent, but also as a classic statement in furtherance of the conspiracy. Warme intended by this statement to convince the officers that he had a good connection and meant business, even though the officers were not permitted to meet that connection.

We do not believe that the statement was inadmissible hearsay as to Delli Paoli. First, the statement was sufficiently reliable, for it was a statement in furtherance of the conspiracy and against penal interest when made. *See United States v. Puco*, 476 F.2d 1099, 1107 (2d Cir.), *cert. denied*, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). Second, there was sufficient independent non-hearsay evidence that Delli Paoli was a member of the conspiracy, as our recitation of the facts amply shows.

## "FAT" TONY SALERNO AND THE PLEASANT AVENUE PEOPLE

■ Warme and Delli Paoli claim reversible error in the admission of Caracappa's testimony that Warme told him on March 9 that Delli Paoli was "hooked up with 'Fat' Tony Salerno and the Pleasant Avenue People." Appellants argue that this testimony unnecessarily injected into the trial the spectre of organized crime. We disagree.

Caracappa's passing reference to " 'Fat' Tony Salerno and the 'Pleasant Avenue people,' " standing alone, was not sufficiently prejudicial to require a mistrial. Appellants' claim that the jury necessarily inferred from this testimony that the defendants were involved in organized crime certainly overstates any impact this testimony might have had. Even assuming that appellants may know that "Fat" Tony Salerno was associated with organized crime, mention of Salerno's nickname, by itself, could not convey the same meaning to the jury. For all the jury knew, "Fat" Tony could have been a blues singer, a jazz musician, a pool player, or a wrestler. The district court, furthermore, gave a cautionary instruction and the government did not pursue this matter any further.

## DESTRUCTION OF ROUGH DRAFTS AND NOTES

■ Warme and Delli Paoli claim that the district court should have stricken the testimony of government witnesses who had destroyed their original notes made during the course of the investigation. The handwritten notes at issue were made by agents Caracappa and John Mullen, the surveillance agent who observed many of the defendants' meetings. Caracappa testified that he had made numerous handwritten reports during the course of the investigation and that, in accordance with the normal procedure followed at that time, he had discarded his handwritten notes and drafts after he had checked typewritten copies for accuracy. Similarly, officer Mullen had discarded his handwritten notes after he had put all the information they contained into typewritten final reports. Caracappa's and Mullen's final typewritten reports were disclosed to defense counsel as § 3500 material.

In suggesting that the failure to preserve handwritten notes should require a new trial, appellants rely on our decision in *United States v. Bufalino*, 576 F.2d 446 (2d Cir. 1978). In *Bufalino*, defendants contended that certain tape recordings should have been suppressed because an agent had destroyed a duplicate tape which might have shed some light on numerous gaps and inaudible passages in the tape recordings admitted at trial. Both we and Judge Lasker sharply criticized the FBI practice of destroying such material. Because the evidence of guilt was substantial, however, we affirmed the convictions. We nevertheless stated that we would look "with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act 'statement' by reference to 'department policy' or 'established practice' or anything of the like. . . . Where, as here, destruction is deliberate, sanctions

will normally follow . . . unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." 576 F.2d at 449. We do not, however, believe that *Bufalino* requires a new trial or dismissal of the indictment here. *Bufalino* was filed on May 10, 1978, after the investigation in this case was completed and all original notes destroyed. No useful deterrent purpose would be served by penalizing the government for having followed a policy which we understand has since been abandoned.

## ENTRAPMENT

■ Warme contends that the district court's refusal to give an entrapment charge as requested was reversible error. To be entitled to an entrapment charge, the defendant must produce some credible evidence tending to show that government agents induced him to commit the crime. *United States v. Henry,* 417 F.2d 267, 269 (2d Cir. 1969), *cert. denied,* 397 U.S. 953, 90 S.Ct. 980, 25 L.Ed.2d 136 (1970). Although Warme had sufficient opportunity to introduce such evidence if he had it, he made no attempt to introduce evidence of inducement. As a result, there was no evidence from which the jury could infer inducement or entrapment. The district court was clearly correct in refusing to give any entrapment charge.

## LORRAINE

■ Warme argues that the district court should have ordered the government to disclose whether the woman named Lorraine, who introduced Caracappa to Warme, was a government informant. Lorraine was not called as a witness. Warme's counsel wanted to know more about Lorraine's precise relationship with the government in the hope that such information might help an entrapment defense. The district court indicated when counsel first demanded disclosure of Lorraine's status that it would not order disclosure until counsel brought forth some evidence tending to support an entrapment defense. Counsel never introduced any evidence tending to support an entrapment defense. As Lorraine's rela-

tionship with the government was therefore irrelevant to the issues presented by defendant at trial, the district court properly refused to order the requested disclosure. *See United States v. Edmonds,* 535 F.2d 714 (2d Cir. 1976); *United States v. Soles,* 482 F.2d 105 (2d Cir.), *cert. denied,* 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973). *Cf. Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

## THE MARCH 30 CONVERSATION

■ Defendant Isaza argues that the district court erred when it admitted into evidence portions of a March 30, 1978 tape-recorded telephone conversation between defendant Wayne Petrucha and undercover officer Caracappa. This conversation tended to show that Isaza had acted with Petrucha in selling cocaine to Caracappa.

The March 30 conversation occurred after Warme had taken from Petrucha several ounces of cocaine without paying for it. During the first part of the conversation, Diane Warme told Caracappa that the "spics" had sent a "message" that "me and Wayne are 'dead' if this thing ain't straightened out by tomorrow evening." Petrucha then told Caracappa that Isaza was connected to the source for the cocaine that Warme had taken, that Isaza was the person who had done business before with Caracappa, and that Isaza's friends had threatened to get Petrucha if he did not pay for the cocaine that had been stolen. The government introduced this conversation as one made in furtherance of the conspiracy.

Although this conversation clearly had probative value, Isaza contends that any probative value was substantially outweighed by its prejudicial impact. The district court balanced the probative value and the prejudicial impact and concluded that the evidence was admissible. We find no abuse of discretion in that conclusion. *Cf. United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (death threat evidence).

The appellants' remaining contentions do not merit discussion.

Affirmed.