UNITED STATES of America,

v.

Peter FEILBOGEN, Allan Shapiro, Benson Sheinkin, and Stephen Lichtman, Defendants.

No. 80 Cr. 57.

United States District Court, S. D. New York.

July 14, 1980.

---

**807**

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for the U. S. of America; Betty Santangelo, Asst. U. S. Atty., New York City, of counsel.

William I. Aronwald, White Plains, N. Y., for defendant Allan Shapiro.

Jacob Laufer, New York City, for defendant Peter Feilbogen.

Melvin M. Lebetkin, Kew Gardens, N. Y., for defendant Stephen Lichtman.

Joel Winograd, New York City, for defendant Benson Sheinkin.

## OPINION

ROBERT L. CARTER, District Judge.

*The Issue and Facts Involved*

I

Defendants, Peter Feilbogen, Allan Shapiro, Stephen Lichtman and Benson Sheinkin, were tried on a two count indictment. All four were charged with conspiracy to manufacture and possess methaqualone, and Feilbogen and Shapiro were charged with aiding and abetting the manufacture and possession of the controlled substance as well. After trial which began on May 14, 1980, and concluded on June 13, 1980, the jury found Feilbogen and Shapiro guilty on the substantive count, and Feilbogen, Shapiro and Lichtman guilty on the conspiracy count. The jury could not agree as to Sheinkin, and a mistrial as to him was declared.

At the trial Alfred Cavuto, Special Agent of the Drug Enforcement Administration ("DEA"), testified that he had made rough notes contemporaneous to the surveillances he had undertaken of the various defend-ants but had destroyed these notes once he had completed a handwritten draft of his formal reports. He stated that he wrote out his reports in longhand on a DEA form # 6, relying on the surveillance notes and his memory. Included in his reports were the observations of other DEA agents conveyed to Cavuto orally as to what they had seen. When a longhand draft was completed, it was given to a secretary for typing, and on receipt of the typed report from the secretary, both the handwritten notes and the handwritten draft were destroyed. Russell Williams, another DEA Special Agent, testified that he had made no contemporaneous notes but had prepared handwritten drafts of his formal reports, had sent these drafts to the typist and on receipt of a typed copy of his handwritten draft, he had shredded the pertinent draft. In apparent reliance on the views expressed in *United States v. Anzalone*, 555 F.2d 317, 321 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Mase*, 556 F.2d 671, 676 (2d Cir. 1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508 (1978); *United States v. Bufalino*, 576 F.2d 446, 448–50 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 32 (1978); and *United States v. Paoli*, 603 F.2d 1029, 1036–37 (2d Cir.), *cert. denied*, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979), defendants moved for dismissal of the indictment or, in the alternative, to strike the agents' testimony.

The motion was brought on in the middle of the trial, and the matter was set down for hearing after trial, if necessary. Since three of the defendants were found guilty, hearing on the motion was required, and the hearing took place on June 23–24, 1980. Although, as indicated, a mistrial had been declared as to Sheinkin, he joined in the application of the other defendants to dismiss the indictment for the alleged misconduct of the DEA agents and participated in the hearing.

II

At trial and at the subsequent hearing, the evidence disclosed that the only rough

contemporaneous surveillance notes in question were those taken by Cavuto, and that Cavuto had filed reports of all the surveillances involved, including the observations of all the other special agents, except for the surveillance of December 12, 1979, the report of which was written by Special Agent Russell Williams.

In addition to surveillance notes, defendants contended that interview notes were destroyed. Cavuto interviewed Richard Pedis, a government witness, who had identified Lichtman from a photographic display as a person who had made several purchases of equipment from the New York Laboratory Supply Co. where Pedis worked. Cavuto testified that he saw Pedis on two occasions, that he took no rough notes at the time of the interviews and that during the first or second interview he wrote out a receipt for Pedis for the original invoices Pedis had turned over to the government. Pedis testified that when he was interviewed by Cavuto, he saw him writing something down on paper. In reference to all the reports, the drafts attributed to Williams were prepared a few days after the events in question, but Cavuto's drafts at times post-dated the events by several weeks.

The defendants have offered as providing the bases for their entitlement to sanctions exhibits A and 3500 RR, 3501 I, 3501 J, 3501 K, 3501 L, 3501 M, 3501 N, 3502 NN, 3502 OO, 3514 A and 3514 B, the final reports of Cavuto and Williams in which all previously recorded rough notes or handwritten drafts had been destroyed. Except for exhibits A and 3500 RR, the reports concern investigations undertaken in this proceeding about which Cavuto, Williams or other DEA special agents testified at trial. All the reports in question were completed and filed by mid-January, 1980.

The first two reports, 3500 RR and Ex. A, recite the arrest of Donald Ciota in September, 1979, and summarize statements made by Ciota to government personnel at that time. Ciota was the government informer in this case, and the principal witness in the government's case against Shapiro and Feil-

bogen. Ciota was neither on trial nor under indictment in this proceeding. Thus, these two reports were made in connection with a separate indictment and putative prosecution and were not a part of the investigatory effort involved in the case against these four defendants.

3501 I is a report of the November 19, 1979 surveillance of Shapiro, including the time of his morning arrival at Kem Chemical Co., where Ciota worked, his exit carrying a package and his arrival at his office in Greenvale, New York and further surveillance until approximately 11:00 P.M. when Shapiro's car was seen in his garage in Valley College, New York. The report also contains Ciota's report to Cavuto about a November 20 conversation with Shapiro. Ciota testified at the trial about Shapiro's coming to Kem Chemical on November 19, and the conversation with him on November 20.

3501 J is a report that Ciota advised Cavuto that on November 28, 1979, Shapiro had made various purchases of chemicals from Kem Chemical. The circumstances surrounding these purchases were related by Ciota from the witness stand at trial.

3501 K is Cavuto's report of a conversation Ciota had with Shaprio on December 7, 1979, about which Ciota testified at trial.

3501 L is a report of the December 28, 1979, and January 2, 1980 meetings of Allan Shapiro with Ciota. The report recites what Ciota reported to Cavuto concerning what Shapiro told Ciota on those two occasions. At the trial, Ciota testified concerning these conversations.

3501 M is Cavuto's report of the December 18 surveillance of Shapiro entering Kem Chemical, leaving with Ciota, both carrying boxes, arriving at the Chemical Bank, dropping Ciota off at Kem Chemical, and driving to his office. The report further details the surveillance of Shapiro in the afternoon, driving from his office to Sizzler Steak House, the arrival of Sheinkin and Lichtman in a BMW, the two cars driving to a parking area in front of Shangri La diner, the transfer of the boxes from Shapiro's to Lichtman's car, the arrival of Feilbogen and

all four sitting in Lichtman's car conversing, the departure of the three cars, the continued surveillance of Lichtman and Sheinkin to 2353 Foster Avenue, and the observations inside apartment 2 C from the street and rooftop of a building directly across the street from the Foster Avenue apartment.

The first part of the report involving Ciota and Shapiro was testified to by Ciota. The second part of the report concerning what happened at the Sizzler's Steak House, the parking area and the Shangri La diner, the drive to Brooklyn and 2353 Foster Avenue, and what went on inside apartment 2C was related in substantial part on the witness stand by Benson Sheinkin.

3501 N is a report that Ciota informed Cavuto on December 18, 1979, that he was to have dinner with Shapiro and Feilbogen the next day and that they were to meet at 7:30 P.M. in front of 90 Church Street. The report also states that Cavuto fitted Ciota with a Nagra recorder on December 19, 1979, recites the surveillance of Ciota, Shapiro and Feilbogen being driven in Shapiro's car from Church Street, where Ciota was picked up, to the Homestead Restaurant, and from the restaurant, back to Church Street where Ciota left the car, the removal of the recorder from Ciota, and William's surveillance of Shapiro and Feilbogen to the Long Island Railroad Station at 34th Street in Manhattan. Ciota testified concerning these events, up to the time he left Shapiro and Feilbogen at Church Street. Moreover, the conversation from the time Ciota got in the car with Shapiro and Feilbogen until they dropped him off back at Church Street was recorded and the tape was played to the jury.

3502 OO is Cavuto's January 3, 1980 report of surveillance of Shapiro, the execution of the search warrant of apartment 2C, 2353 Foster Avenue, and the arrest of Shapiro and Lichtman. Exhibits of what was seized in the apartment were introduced at trial, as were photographs of the apartment and what was in it at the time of the search.

3502 NN is Williams' December 12, 1979 report of surveillance of Shapiro entering Kem Chemical, leaving with a package, driving to a garage on 44th Street between 5th and 6th Avenues, the arrival of Lichtman in the garage, his opening the trunk of Shapiro's car, removing the package and taking it to his car, in which a woman was sitting, and driving off followed by Williams who then saw Lichtman and the female look into the package. The only testimony at trial concerning these incidents came from Williams and another special agent.

3514 A and B are Cavuto's reports of his meetings with Richard Pedis, a salesman for the New York Laboratory Supply Co., and what Pedis told him, the showing to Pedis of a photo spread and the latter picking out the photograph of Lichtman as the man who had made various purchases of equipment from the company. Pedis testified concerning these matters from the witness stand.

### III

Prior to 1976, it was the policy of federal law enforcement agencies to destroy all rough notes and handwritten drafts of surveillances and interviews. Only the final typed reports were kept. In 1976, pursuant to *United States v. Harrison,* 524 F.2d 421 (D.C.Cir.1975), and *United States v. Harris,* 543 F.2d 1247 (9th Cir. 1976), DEA instituted a policy requiring its agents to retain all rough notes of interviews of potential witnesses, but this new policy did not mandate the preservation of surveillance notes and the handwritten drafts of all reports, unless these covered an interview of a witness.

In October, 1979, new instructions were issued. In addition to being required to preserve rough interview notes, agents were advised to retain all rough notes of surveillance "which contain information that may ultimately be included in formal reports or which record events about which the agent may later testify" and handwritten draft reports which are the agent's first written record of a surveillance or interview. (See Ex. 2, October 23 teletype from

office of DEA Chief Counsel). Thus, under the new policy all rough notes either of interviews or surveillances were to be kept, and if no contemporaneous notes were taken, the first handwritten draft of the agent's report had to be retained. This new policy was disseminated to all DEA domestic offices by teletype (Ex. 2), and was received in the New York office by the Special Agent-in-Charge. Copies of the teletype were made and, according to the legend on the document, distributed on October 23, 1979, to the supervisors of each group.[1]

Kevin Gallagher, Assistant Special Agent-in-Charge (ASAIC), charged with overall supervision of group 7, the group responsible for the investigation in this case and to which Cavuto and Williams belonged, testified that a meeting was held of all group supervisors about 5 days after October 23, 1979; that at this meeting the contents of the teletype were discussed and all supervisors were told to advise the men in their group of the new policy. He did not recall whether John Toal, supervisor of group 7, was at the meeting, nor did he follow up the meeting to ascertain whether the new policy had reached all the agents. He testified that since on its face the teletype indicated that a copy had been sent to the supervisor of each group, he did nothing further, apparently assuming that each supervisor had received a copy of the teletype and had distributed copies to the agents in his group.

John Toal, supervisor of the group to which Cavuto and Williams belong, did not recall being at the meeting when the October 23, 1979 teletype was discussed. He testified that he had not seen the October teletype until 4 or 5 days before the instant hearing, that is in early June, 1980. Cavuto, at the suggestion of the Assistant United States Attorney handling this case and in preparation for this hearing, had made inquiries at the New York office about the document. He asked the secretary of his

group about the teletype, but she could not locate it. A copy of it was given to him by the secretary of the ASAIC. It was only then that Toal, Williams and Cavuto learned of the October 23, 1979 announcement of the new policy.

In February or March, 1979, preparation of DEA Legal Comment No. 22, which in substance takes the same view regarding retention of notes and drafts as the October 23, 1979 teletype, was begun in the chief counsel's office. It was sent to the printers in September, 1979, but was subsequently recalled to include comment on two recent pertinent decisions: the first 9th Circuit opinion in *United States v. Bernard*, 607 F.2d 1257 (9th Cir. 1979), and the opinion of the 2d Circuit in *United States v. Paoli, supra*. These comments were completed in December, 1979, and the document was sent back to the printer. The manuscript was returned from the printer to the chief counsel's office in early January, 1980, and distributed to the DEA offices several weeks later. The document was received in the New York office in February, 1980. Copies were made, and a copy was placed in the box of each group sometime during February.

Robert Richardson, DEA Deputy Chief Counsel, testified that all policy directives, including the teletype dated October 23, 1979, were included in the basic DEA manual, two copies of which are provided for each group. However, Gallagher testified that he had looked at the DEA manual in New York and that there was nothing in the manual about the retention of notes.

Cavuto testified at trial that prior to April 18, 1980, it was his understanding that DEA's policy required retention of all rough notes of interviews and did not require retention of the rough notes of surveillances; that he had never seen a written directive from DEA headquarters on the question prior to April 18, 1980; that he understands DEA policy as of April 18, 1980, to require retention of all rough notes

1. The special agents in the New York office are organized into groups; each group works under a supervisor, with overall supervision of all the groups being divided between the two ASAIC's.

of both interviews and surveillances. Williams testified at trial that it was his understanding until April 18, 1980, that rough notes of surveillance had to be retained but interview notes did not. Both he and Cavuto testified that there was no requirement that handwritten drafts of their reports be preserved.

*Determination*

I

Defendants contend that the destruction of the surveillance rough notes and the handwritten drafts was a deliberate violation of both DEA policy and the law announced by the circuit in *United States v. Bufalino, supra,* and cognate cases. They further contend that having Cavuto file in a single report not only his observations but those of other special agents was prejudicial and denied them the right and opportunity of meaningful cross examination since this practice had prevented their eliciting inconsistencies in the testimony of the various agents. They also claim that when Cavuto received the surveillance observations from the various agents, what was told him by an agent constituted an interview, and thus since any notes he made concerning what the agents told him were interview notes, without regard to whether surveillance notes should have been preserved, these interview notes should have been retained. They argue that Cavuto's detailed reports, written weeks after the events, included detailed descriptions of other agents; that it was inconceivable that reports with such particularized specifications could have been done from memory, but must have been based on the written reports of those agents, as well as on his own notes. They also allege that even if no rough notes were made, the handwritten reports of Williams and Cavuto should have been preserved since these longhand reports constituted the first writings on the incidents in question. Finally, they contend that Pedis' testimony reveals that Cavuto took interview notes when Pedis was questioned.

The government argues that the rough surveillance notes do not constitute Jencks Act (18 U.S.C. § 3500) material, relying on the revised opinion in *United States v. Bernard,* 623 F.2d 551 (9th Cir. 1980); that most decisions dealing with this issue heretofore, *e. g., United States v. Mase, supra; United States v. Anzalone, supra; United States v. Terrell,* 474 F.2d 872, 877 (2d Cir. 1973), focused on the retention of interview notes of potential witnesses and defendants and not surveillance notes; that there is no clear cut policy concerning retention of surveillance notes, and that sanctions are not warranted in any event since destruction of the notes and handwritten drafts at issue here cannot be attributed to the government's bad faith and did not prejudice defendants.

II

The testimony revealed that confusion or misunderstanding existed among DEA Special Agents in the group responsible for the investigation of concern here as to what an agent was required to do in respect of retaining of notes and drafts. Special Agent Cavuto believed until April, 1980, that he was not required to retain rough notes of surveillance but that he was required to keep his rough notes of interviews. Williams was under the impression that DEA policy required the retention of rough notes of surveillance but not those of interviews. Both believed themselves under no policy requirement to retain the rough drafts of their reports whether of interviews or surveillance. The October, 1979 teletype spelling out the new policy and Legal Comment # 22, which sought to explain that policy in more detail, were not brought to the attention of the group until after all reports in this case had been completed. Legal Comment # 22 was placed in the Special Agents' folders sometime in February, 1980, at the earliest, and the October, 1979 teletype was not seen by Cavuto, Williams, or their group supervisor until June, 1980 when Cavuto uncovered a copy of it in preparation for this hearing.

DEA Chief Counsel had sent out the teletype in October, 1979, announcing a new DEA policy requiring retention of surveillance rough notes and, in some instances, rough drafts of reports. Thus, as of October, 1979, DEA policy was that contempora-

neous rough notes of interviews, surveillances and rough drafts of reports of these activities when the rough drafts were the agent's first writings on the events were to be retained. The teletype was received in the New York office, but it was not distributed to the group involved in this investigation until sometime in early June, 1980. The ASAIC should have been more diligent in making certain that the contents of the teletype reached all agents under his supervision. In addition, the DEA manual should have been modified to reflect the new policy, but apparently no mention is made of DEA policy on retention of notes in the manual in the New York office. This would seem to imply that at least insofar as the New York office is concerned, the enforcement arm of the DEA and the chief counsel's office are not working together as closely as they should. In the future it would be advisable for the New York office to put a higher priority than it seems to have done thus far on insuring that all special agents working out of DEA headquarters here understand DEA policy in respect to the retention of rough notes and drafts made incident to an investigation.

On this record, however, there is no basis for finding anything other than good faith by DEA and the Special Agents involved. Nonetheless, I am not certain that such good faith is relevant if the destruction of the notes was contrary to the law of the circuit. In *United States v. Bufalino, supra,* 576 F.2d at 449, the court stated that where law enforcement agents had destroyed material they should have preserved, sanctions would be applied "irrespective of the perpetrator's motivation unless the government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." *See also United States v. Indian Boy X,* 565 F.2d 585 (9th Cir. 1977), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). *But see United States v. Gantt,* 617 F.2d 831, 841–42 (D.C.Cir.1980); *United States v. Shovea,* 580 F.2d 1382, 1390 (10th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Niederberger,* 580 F.2d 63, 71 (3d Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978);

*United States v. Mase, supra.* It is clear that both Cavuto and Williams violated the existing DEA policy—the former in destroying rough surveillance notes, and both in destroying rough drafts of reports which constituted their first written records of these activities. However, that fact alone affords defendants no rights they would not otherwise possess. Cavuto's and Williams' breach of DEA policy is of no consequence for our purposes unless that infraction simultaneously violated procedures mandated by the Court of Appeals.

The cases holding that rough notes of a law enforcement officer's investigation should be retained have generally reasoned that such contemporaneous notes were discoverable material within the meaning of the Jencks Act, 18 U.S.C. § 3500, Rule 16, F.R.Cr.P., and the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See, e. g., United States v. Harrison, supra,* 524 F.2d at 433; *United States v. Harris, supra,* 543 F.2d at 1252–53; *United States v. Bufalino, supra,* 576 F.2d at 449. Most of these cases have focused on rough notes of an agent's interview of potential witnesses. *See, e. g., United States v. Gantt, supra; United States v. Angelini,* 607 F.2d 1305 (9th Cir. 1979); *United States v. Crowell,* 586 F.2d 1020 (4th Cir. 1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *United States v. Vella,* 562 F.2d 275 (3d Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978).

In *United States v. Bufalino, supra,* it was held that tapes of conversations between defendants and a government witness constituted discoverable material under the Jencks Act and Rule 16, F.R.Cr.P., and should have been preserved.

*United States v. Paoli, supra,* assumed but did not decide that rough contemporaneous surveillance notes were covered by the ruling in *Bufalino.* The court did not explore the question whether a law enforcement agent's rough surveillance notes are akin to rough notes of interviews with potential witnesses in being discoverable material under the Jencks Act, Rule 16, F.R. Cr.P., and/or the rule in *Brady.* Perhaps the court did not address this question be-

cause it had decided not to apply sanctions in any event since the destruction of the notes in *Paoli* had predated decision in *Bufalino*. Nor has this circuit specifically determined whether rough, handwritten drafts of final reports should be preserved.

The issue as to whether surveillance notes are discoverable material in a criminal trial was examined at some length by the 9th Circuit in its revised opinion in *United States v. Bernard, supra,* which held that rough notes of surveillance did not constitute discoverable material within the meaning of the Jencks Act or Rule 16, F.R.Cr.P.

In *United States v. Lane,* 574 F.2d 1019 (10th Cir.), *cert. denied,* 439 U.S. 867, 99 S.Ct. 193, 58 L.Ed.2d 177 (1978), the court distinguished the holdings in *United States v. Harris, supra,* and *United States v. Harrison, supra,* on the ground that the two cases related to rough notes taken contemporaneously with an interview or interrogation and which are intended to be factual only. Discrepancies between such notes and what appears in the final report or official statement may aid the accused. *Id.* at 1022. However, it was held that the rough notes of an agent's activities written hours or even days after the event may record the agent's impressions and involve diverse persons. The court concluded that to require the preservation of rough drafts would be an unwarranted invasion of the functions of law enforcement.

While my own view on both issues accords with those expressed in the revised *Bernard* holding and in *Lane,* I need not, to decide this case, break new ground, at least in this circuit, which is more properly the function of the Court of Appeals in any event. For, even giving *Bufalino* and *Paoli* their most expansive reading—that is, that they cover both contemporaneous rough notes of surveillances and rough handwritten drafts of an agent's report—the destruction of the notes and rough drafts in this case were clearly not prejudicial to defendants.

Virtually everything in the agents' reports was placed before the jury by other independent evidence—testimony of witnesses or tapes. The two reports relating to Ciota's arrest and the charges against him, of course, did not relate to this case. Nonetheless, defendants were allowed wide latitude in thoroughly examining Ciota about his past misbehavior, the money made in connection therewith, and the circumstances surrounding his arrest. Cross examination was curbed as to these matters only at the point where it appeared that we would be launched into a trial of Ciota. Cavuto's report about what Ciota told him of his meetings with Shapiro were testified to by Ciota at trial, and corroborated in some cases by tape recordings and photographs. Moreover, Cavuto's reports on those conversations contain no verbatim statements by Ciota, and the jury had before it the tape recordings and Ciota's testimony itself to rely on to convict the defendants. In respect of Shapiro and Feilbogen, what was not independently testified to or brought out on tape were unimportant details of surveillance.

The report of the surveillance of December 18, 1979, was substantially corroborated by Benson Sheinkin, one of the defendants, when he took the witness stand. Cavuto's report of his interview with Pedis was fully supported by the latter's testimony from the witness stand. The defendants gain nothing from Pedis' statement that he saw Cavuto writing something when he, Pedis, was being interviewed. Pedis did not testify as to what was being written, and Cavuto testified that he wrote out a receipt for Pedis of the invoices the latter had turned over to the government. Finally, Cavuto's report of surveillance of January 3, the execution of the search warrant and the arrest of Lichtman and Shapiro contained no prejudicial matter that could have been turned to defendants' advantage had the agents' rough notes been retained. What was found in the apartment was corroborated by photographs and the showing of the articles themselves.

Williams' report of December 12 is the only surveillance report that is not corroborated by other evidence; but this evidence was not critical.

The record will reveal that defendants were granted wide latitude in cross examination. It is simply inconceivable that Ca-

vuto's rough shorthand notes, written in haste on bits of paper, could contain anything which would afford defendants the basis for any more extensive or searching cross examination than was allowed. The handwritten drafts were the agents' initial reports. The differences between what was written and typed, as I understand it, were chiefly in corrections of typographical errors and style. These discrepancies would provide no basis for any more substantial latitude in cross examination than was permitted.

The tape recordings of Shapiro's and Feilbogen's unguarded conversations with Ciota were extremely damaging to them. The photographs of Lichtman in the apartment, and Sheinkin's testimony that he and Lichtman had earlier met Shapiro and Feilbogen, had transferred the boxes of chemicals from Shapiro's car to Lichtman's, that they had taken some of the chemicals into the apartment that night, that while he was in the apartment with Lichtman he had seen the latter handling filter paper with white powder on it were independent sources that fully supported critical portions of the agents' testimony. Undoubtedly, it was this evidence that helped seal defendants' fate with the jury.

Nor is there a basis for holding that having an agent (Cavuto) responsible for almost all the surveillance reports and having him include in his report the observations of other agents were deliberately done to impede defendants' opportunity to develop inconsistencies in cross examination. Indeed, the government is under no duty to create discoverable material for defendants' use. *See United States v. Lieberman*, 608 F.2d 889, 897 (1st Cir. 1979), *cert. denied*, ―― U.S. ――, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980). Moreover, none of the salient testimony of Ciota as to Shapiro's purchases of chemicals, as to the meetings of the various defendants, transfer of the chemicals to Lichtman's car on December 18, Sheinkin's and Lichtman's subsequently taking these boxes into the apartment, or the substance of the taped conversations was contested in any way. The defense seemed to be that neither Shapiro nor Feilbogen knew that the chemicals were being used for illegal purposes, that Lichtman was using the chemicals to indulge in a legitimate hobby (although the hobby was never identified), and that Sheinkin had become involved inadvertently on December 18, because Lichtman had invited him over to Foster Avenue to see whether the dental equipment which had been left by the former occupant of apartment 2C could be used by him.

In view of the grounds on which decision is based as to whether Cavuto's detailed reports made some weeks after trial are matters culled from his own rough notes and his memory or are in part based on the rough notes of other agents is irrelevant, as is the argument that an agent's surveillance observations become the product of an interview after being orally related to another agent.

No conceivable prejudice resulted to any of the defendants. Accordingly, the motion is denied in all respects.

IT IS SO ORDERED.