UNITED STATES of America, Appellee,

v.

Edward V. MASE, Appellant.

No. 1020, Docket 77-1009.

United States Court of Appeals,
Second Circuit.

Argued April 19, 1977.

Decided June 6, 1977.

Rehearing Denied July 28, 1977.

Jacob D. Zeldes, Bridgeport, Conn. (Zeldes, Needle & Cooper, Bridgeport, Conn., Frank J. Silvestri, Jr., Bridgeport, Conn., of counsel), for appellant.

Peter R. Casey, III, Sp. Atty., U. S. Dept. of Justice, Hartford, Conn. (Peter C. Dorsey, U. S. Atty., D. Conn., New Haven, Conn., of counsel), for appellee.

Before MOORE, SMITH and FEINBERG, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Edward Mase appeals from a judgment of conviction by the United States District Court for the District of Connecticut, Jon O. Newman, Judge. Mase and Edward Gianotti were each indicted on one count of conspiracy and one count of using extortionate means to collect an extension of credit to Paul Dwyer, in violation of 18 U.S.C. § 894.[1] Following a three-day trial, the jury found Mase guilty on the substantive count and was unable to reach a verdict on the conspiracy count.

Extended discussion is warranted on only two of the many arguments Mase raises on appeal: that the evidence was insufficient to support the jury's verdict and that a trial in Hartford after a mistrial in New Haven, due to pre-trial publicity, requires reversal. We find no error and affirm the conviction.

I.

Dwyer testified that in 1972 he had placed bets with an Edward Papagoda and

---

1. Section 894(a) says:

Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonpayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

had lost about $1,250, of which he had repaid $285. In May, 1976 Dwyer began betting with Gianotti, and by June 5, 1976 Dwyer was ahead about $1,600 in his bets with Gianotti. On June 5 and June 6, Dwyer placed numerous bets on sporting events with Gianotti and lost about $5,600. On June 8 Dwyer told Gianotti that he needed time to pay his debt. On June 15 Dwyer got a message to call Mase, whom he had never met, and on June 17 Mase and Dwyer had the first of several meetings. According to Dwyer, during the next week Mase twice threatened to assault him if he did not pay at least $1,000 by June 22. On June 21 Dwyer went to the FBI, for whom he had previously been a paid informant. On June 22 Mase came to Dwyer's house and again threatened to assault him.

Unknown to Mase, Dwyer was wearing a body recorder, and two FBI agents were in the next room. When Mase unexpectedly opened the door to this room, he was placed under arrest. The recording of this June 22 conversation between Mase and Dwyer, along with the recordings of a previous telephone conversation on June 22 between Mase and Dwyer and a later telephone conversation on June 22 between Dwyer and Gianotti, tend to corroborate Dwyer's testimony. Mase offered no evidence.

Mase does not claim that the jury could not have believed Dwyer's testimony. Mase does claim that under these facts there was, as a matter of law, no extension of credit to Dwyer by Gianotti between June 4 and June 6, 1976, as alleged in the Bill of Particulars.

Section 891(5) of Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 *et seq.*, says "to collect an extension of credit means to induce in any way any person to make repayment thereof," and § 891(1) says "to extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim . . . however arising, may or will be deferred." Mase argues that between June 4 and June 6 there was neither a loan nor an agreement to defer repayment of any debt or claim.

Title II contains no definition of a loan, a debt, or a claim. Mase relies on cases involving tax treatment of a transaction,[2] the application to an Illinois official of the Hatch Act, 5 U.S.C. § 1501 *et seq.*,[3] and the interpretation of a commercial contract[4] to support his argument that a loan always involves the "delivery of money or advance of funds . . . it cannot encompass the placing of a bet." (Appellant's Brief, at 30). These cases are not, however, determinative in construing a criminal statute. We think Congress intended a broad definition. The jury could decide under § 891(1) if there was a loan or an agreement to defer repayment of "any debt or claim . . . however arising. . . ." We think Judge Newman's supplemental jury charge on the essential point—whether there was an extension of credit—was adequate.[5]

---

2. *Bankers Mortgage Co. v. Commissioner*, 142 F.2d 130 (5th Cir.), *cert. denied*, 323 U.S. 727, 65 S.Ct. 61, 89 L.Ed. 583 (1944); *Holley v. United States*, 124 F.2d 909 (6th Cir.), *cert. denied*, 316 U.S. 685, 62 S.Ct. 1276, 86 L.Ed. 1757 (1942).

3. *Palmer v. United States Civil Service Comm'n*, 191 F.Supp. 495 (S.D.Ill.1961), *rev'd* 297 F.2d 450 (7th Cir.), *cert. denied*, 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962).

4. *In Re Grand Union Co.*, 219 F. 353 (2d Cir.), *cert. denied*, 238 U.S. 626, 35 S.Ct. 664, 59 L.Ed. 1495 (1915); *National Bank of Paulding v. Fidelity & Casualty Co.*, 131 F.Supp. 121 (S.D.Ohio 1954).

5. Judge Newman's supplemental charge said, in pertinent part:

> I referred at one point to the government's claim that there was an extension of credit with respect to wagering losses of Mr. Dwyer's with respect to Mr. Papagoda. That was the amount that is alleged to be about $985 and I think I mentioned to you the defendant's claim that that debt was forgiven. I simply want to make it clear to you that if you are not persuaded that that gambling debt was existing, that is, you don't have to find it was extinguished.
>
> The burden is on the government to show it existed. If you are not persuaded beyond a reasonable doubt that that transaction gave rise to an existing extension of credit at the time that this defendant is alleged to have used or participated in the use of extortionate means, then you would not be able to find

Mase's requested charge might well have confused the jury.

■ Mase concedes that "in this case, as the evidence developed, the essential element in issue was what, if anything, constituted an agreement to defer repayment." (Appellant's Reply Brief, at 10). While not every placing of a bet involves a simultaneous agreement to defer repayment,[6] the jury could find, based on the evidence concerning the past relationship of Gianotti and Dwyer, that when Dwyer placed the bets with Gianotti on June 5–6 there was at that time a tacit agreement between them that Dwyer was deferring repayment of Gianotti's debt if Dwyer won and that Gianotti was deferring repayment of Dwyer's debt if Dwyer lost. We think Congress intended to cover such activity even if the creation of the debt and the extortionate collection are not engaged in by members of organized crime or loan sharks. *United States v. Schwartz*, 548 F.2d 427, 428 (2d Cir. 1977); *United States v. Sears*, 544 F.2d 585, 586 (2d Cir. 1976). *Cf. United States v. Briola*, 465 F.2d 1018, 1021 (10th Cir. 1972).

Under the Commerce Clause, Congress has the power to regulate the extortionate credit transaction in which Mase was involved, "though purely intrastate." *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Keresty*, 465 F.2d 36, 42–43 (3d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972).

## II.

Following his arrest, Mase was released on bond, and a preliminary hearing was scheduled for July 12, 1976. On July 12 the government declined to go forward, and Magistrate Arthur Latimer dismissed the complaint and released Mase. On July 13, when a New Haven reporter, Andrew Houlding, inquired of the United States Attorney's office if an indictment had been returned for Mase, he was told by Peter Dorsey, the United States Attorney for Connecticut, that the complaint against Mase had been dismissed for "technical grounds" and because Paul Coffey, the Organized Crime Strike Force attorney, was not prepared to proceed against Mase. Dorsey also told Houlding that the dismissal had had no effect on the continuing investigation of Mase, alleged role in the case and that an indictment of Mase was expected the next day. Mase and Gianotti were indicted on July 14.

On the morning of July 14, the New Haven *Journal-Courier* carried a front-page story by Houlding, part of which said, "In preparation of its case against Mase, federal officials brought before the grand jury a bevy of New Haven-area men who have reportedly been involved in organized criminal activities." The story also summarized Mase's past criminal convictions since 1944. Another story about Mase's indictment appeared in the July 15 *Journal-Courier*. On September 1, 1976, the *Journal-Courier*

that that transaction satisfied the statutory test of an extension of credit.

As I mentioned before, you don't have to find that both that transaction and the Gianotti transaction existed. Either one is sufficient, and in connection with that phrase, extension of credit, I explained, I read you the statutory definition, and I think I explained to you that there are two ways that a transaction can be an extension of credit; either a loan or, without reading all of the statute, an agreement to defer repayment of a debt, and I told you if you find that Mr. Dwyer incurred wagering losses, let's say, to Mr. Gianotti, as an example, you'd be entitled to find that either a loan or an agreement to defer repayment of a debt, that is, an extension of credit, by one of those two terms, arose within the meaning of the statute.

Whether you conclude that is up to you. The statutory definition provides those two ways for an extension of credit to arise, either by a loan or by an agreement to defer repayment of a debt and the factual issue is for you, whether or not, based on the facts as you find them to be, either of those statutory definitions of an extension of credit was existing at the time that extortionate means were used to attempt to collect such extensions of credit.

6. It has been reported that a state betting agency or a bookie may accept deposits of cash to secure payments of telephoned bets, and the usual practice at race track and legal off-track betting windows is the cash purchase and cash redemption of betting tickets.

carried another front-page story by Houlding. It said, in part, "Federal investigative sources claim Mase and Gianotti hold subordinate positions to DeMartin's in the New Haven-Bridgeport area syndicate."

On September 2 Mase moved to dismiss the indictment because of the government's alleged role in generating prejudicial pretrial publicity. On September 27 a jury was selected in less than half an hour, and on September 30 Judge Newman held a hearing on Mase's motion. Houlding testified at the hearing. While he refused to answer some questions and to identify all his sources of information, he did testify about the June 13 conversation with Dorsey and said that some of his information about Mase came from the *Journal-Courier's* files.

On October 5 Judge Newman denied Mase's motion. Judge Newman found that Houlding discovered Mase's alleged connection with organized crime by referring to the *Journal-Courier's* file on Mase's pleading guilty to arson in 1972. Judge Newman criticized the government for telling Houlding that the return of the Mase indictment was expected, but he concluded that the government's comment did not warrant the dismissal of the indictment.

■ In *United States v. Bando,* 244 F.2d 833, 837–38 (2d Cir.), *cert. denied,* 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957), we stressed "the obligation that rests upon all law enforcement agencies to avoid making any public statements concerning the progress of the investigation of a crime or the proof already obtained as to the complicity of any person who is either a defendant or likely to be prosecuted for the crime." While we share Judge Newman's criticism of the government's comments in this case, we also agree with him that the government's conduct does not warrant dismissal of this indictment.

After the jury was sworn on October 5, Judge Newman asked whether any of the jurors had read anything about the crime. Six jurors raised their hands and were then questioned by Judge Newman. Some indicated that they had read a front-page story in the September 29 *Journal-Courier* that

Gianotti had pleaded guilty on September 28. Following the questions, Mase moved to dismiss the indictment. Judge Newman denied this motion, and Mase then moved for a mistrial. Judge Newman granted this motion on the ground that one of the jurors thought, based on the September 29 newspaper story, that Mase had pleaded guilty. Judge Newman rejected Mase's claim that the government was responsible for the September 29 publicity.

The second trial took place in Hartford in early November, 1976. Hartford jurors are not selected from New Haven County. Mase claims that the exclusion of jurors from the county in which the alleged crime occurred violates the sixth amendment.

The sixth amendment does not, however, mention jury divisions. It refers, in pertinent part, only to "an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." While judicial districts are defined by statute, 28 U.S.C. § 81 *et seq.,* jury divisions are established by the district court, with the approval of the Judicial Conference, pursuant to 28 U.S.C. § 1861 *et seq.*

In 1966 Rule 18 of the Federal Rules of Criminal Procedure was amended to delete the requirement that the trial take place in the same jury division as the crime. We have previously suggested that this amendment was constitutional. *United States v. Fernandez,* 480 F.2d 726, 730 (2d Cir. 1973). Here, unlike *Fernandez, id.* at 731, defendant made no offer of proof that the ethnic, economic, and age characteristics of the population of Hartford County differ from those of the population of New Haven County. There was no error in having Mase's trial in Hartford. *Zicarelli v. Gray,* 543 F.2d 466, 479, 482 (3d Cir. 1976) (*en banc*); *United States v. Brown,* 535 F.2d 424, 429 (8th Cir. 1976); *United States v. Cates,* 485 F.2d 26, 28 n. 4 (1st Cir. 1974); *United States v. Florence,* 456 F.2d 46, 50 (4th Cir. 1972); *Franklin v. United States,* 384 F.2d 377, 378 (5th Cir. 1967), *cert. denied,* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968).

We think that transferring the second trial to Hartford was an appropriate way to accommodate the public's right to a speedy and public trial with the defendant's right to a fair trial. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Judge Newman properly denied Mase's motion that the second trial be held in New Haven and be closed to the press. Judge Newman considered that having a second public trial in New Haven would run the risks of again having newspaper stories read by the jurors and of having the second jury chosen from the same array from which the first jury was chosen.

### III.

■ Mase claims it was error to allow the two FBI agents to testify when they had destroyed the notes of their investigation. While "we think that the FBI would be well-advised . . . to retain the handwritten notes until the prosecution is terminated," we reaffirm our previous holdings that the good faith destruction of rough notes does not violate the Jencks Act, 18 U.S.C. § 3500. *United States v. Anzalone*, 555 F.2d 317, 321 (2d Cir. 1977); *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973); *United States v. Covello*, 410 F.2d 536, 545 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969). *Cf. United States v. Harris*, 543 F.2d 1247, 1253 (9th Cir. 1976) (harmless error to refuse to strike testimony of FBI agents because notes were not produced). *But cf. United States v. Harrison*, 173 U.S.App.D.C. 260, 524 F.2d 421, 434 (1975) (full sanctions will be invoked in future cases if the FBI fails to preserve rough notes).

■ Mase claims that the failure to give him a pre-indictment preliminary hearing violates the fifth amendment, the sixth amendment, and Rule 5.1 of the Federal Rules of Criminal Procedure. We reject this claim and reaffirm our previous holding that "an indictment constitutes a finding of probable cause and avoids the need for a preliminary hearing." *United States v. Estepa*, 471 F.2d 1132, 1136 (2d Cir. 1972);

*Sciortino v. Zampano*, 385 F.2d 132 (2d Cir. 1967), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968).

We have carefully considered all of Mase's other claims and find no merit in any of them.

Affirmed.