**UNITED STATES of America,**

v.

**Jerome WALLACE, Defendant.**

No. 93 Cr. 599 (WK).

United States District Court,
S.D. New York.

July 12, 1994.

844

Mary Jo White, U.S. Atty., U.S. Attorney's Office, S.D.N.Y., New York City, for the U.S. (Celeste L. Koeleveld, Asst. U.S. Atty., of counsel).

Lawrence K. Feitell, New York City, for defendant Jerome Wallace.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

The indictment charges defendant Jerome Wallace ("defendant") with four counts: one of conspiring to defraud a federally insured bank in violation of 18 U.S.C. § 1344; one of attempting to defraud such a bank; one of

conspiracy to commit the crime generally known as loansharking in violation of 18 U.S.C. § 894; and one of actually engaging in such illegal activity. The case was assigned to Judge Miriam Cedarbaum in August 1993. Judge Cedarbaum transferred it to us on December 27, and the trial started on January 6, 1994.

Defendant was acquitted of the count charging attempt to defraud, but convicted of the other three counts. During the course of the trial we frequently expressed doubt as to the viability of the prosecution. As to the first two counts, it seemed to us that there was little or no relationship between the allegations of the indictment and the proof at trial. As to the remaining two, it was our view that while there was overwhelming proof of common law (or New Jersey statutory) extortion, by no stretch of the imagination could it be said that defendant violated the federal loansharking statute. However, we denied all motions to dismiss, indicating that in the event of conviction we would entertain a motion for judgment N.O.V. which, if granted, would be reviewable on appeal. Defendant now moves for such a judgment with respect to the counts of which he was convicted. For reasons that follow, we grant his motion.

### BACKGROUND

#### A. The Count Charging Conspiracy to Defraud

With respect to the count charging a conspiracy to defraud, the relevant language of the indictment is:

It was an object of the conspiracy that JEROME WALLACE, * * * and others known and unknown, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, to wit, Citibank, * * * in that the defendants would and did deposit illegitimate checks drawn on New Jersey banks and wrongfully receive payment on the checks * * *.

The Government's version of the evidence relevant to this count, as set forth at pages 3 to 4 of the its memorandum in opposition to defendant's motion, is as follows: [1]

1. This version of the evidence is taken verbatim    from the Government's memorandum, except

The proof presented at trial established that Wallace had obtained a number of stolen checks, approximately ten of which he gave to Carl Corso to cash. The evidence further established that Wallace's preferred method of cashing stolen checks was by using intermediaries, like Corso, to deposit the checks in bank accounts and withdraw the money when the checks cleared. Thus, Corso accompanied Wallace when Wallace demanded money from someone named "Chris," who showed Wallace a deposit slip indicating that checks had been deposited. In addition, Wallace and his brother, Bruce Wallace, took Corso to two banks in the Bronx to attempt to open a bank account and deposit one of the checks. Corso employed Wallace's preferred means of cashing checks when he asked two of his friends in New Jersey to cash the checks using their respective bank accounts. And, Corso and his father asked Capri [a cooperating witness] to cash six of the checks.

At the direction of the FBI, Capri pretended to deposit the checks at Citibank and thereafter to obtain money from the account at Citibank into which the checks had been deposited. Capri gave Corso a copy of the phony deposit slips, indicating that the checks had been deposited at Citibank. Corso in turn gave a copy of the deposit slips to Wallace. After obtaining the copy of the deposit slips, Wallace continued to demand money from Capri. On August 24, 1992, Wallace instructed one of his co-conspirators, Joseph Cox, to accompany Carl Corso to the Blue Moon Cafe to pick up $21,000 from Capri.

## B. The Loansharking Counts

With respect to the loansharking counts, the relevant language as to each is (emphasis supplied):

the defendants and their co-conspirators would and did *sell* illegitimate checks to a cooperating witness ("CW") *on a credit basis,* and then used and explicitly and implicitly threatened to use violence and other criminal means to cause harm to the CW's person, property and reputation, to collect money for the checks.

The Government's version of the evidence claimed to be relevant to these counts, as set forth at pages 24 to 27 of the Government's original memorandum, is as follows: [2]

With regard to Counts Three and Four of the Indictment, the evidence establishes that, after Wallace had given approximately ten checks to Carl Corso, and Corso and his father, in turn, had given six checks to Vinny Capri to cash, Wallace repeatedly demanded payment on the checks, first from Corso and then from Capri himself. Almost immediately, Wallace's demands were accompanied by explicit and implicit threats. Thus, whenever Wallace saw Corso at the construction site where Corso worked, Wallace demanded money on the checks, which, according to Wallace, should have cleared within three or four days of deposit. When Corso did not pay, Wallace threatened to "take action" and prevent Corso from working. Wallace further warned Corso that he should get the money, if he knew what was good for him. To put additional pressure on Corso, Wallace and his co-conspirators stole the Corsos' truck from the construction site.

Meanwhile, Corso met with Capri on August 17, 1992, in Staten Island concerning payment on the checks. During their conversation, which was tape recorded, Corso told Capri about the threats he had been receiving from Wallace. Corso then asked Capri when the money would be available, and Capri told Corso that he expected to get money on Thursday.

After this meeting, and about a day or so after the Corsos' truck was taken, Wallace sent his brother, Bruce Wallace, to Vinny Capri's office to demand payment and threaten Capri directly. Bruce Wallace then asked Capri, "Where is my money?" and Capri responded, "I told Carl that the guy is on vacation, he's going to be back, over the weekend he's supposed to come back." Bruce Wallace complained

that record references have been eliminated.

2. This version of the loansharking evidence is similarly taken verbatim from the Government's Memorandum.

that "[t]his is going on too long," and warned Capri, "if you care for Carl and John Corso, then you better get some money, if you care for them."

Within the next couple of days, in the morning on August 21, 1992, Jerome Wallace himself went to Vinny Capri's office to demand payment immediately. When Capri did not produce the money on the spot, Wallace threatened him as follows: "you don't know who you are playing with, you know. I will put your ass in a soup can." Capri then promised to obtain some money for Wallace later on that day, and Wallace instructed Capri to beep him when the money was ready.

A couple of hours later, Capri met with the Corsos and gave Carl Corso $1,000 and a copy of the deposit slips. Capri explained to Corso that he would have the rest of the money on Monday. Corso arranged to transfer $500 and the copy of the deposit slips to Wallace, and Wallace picked these items up at a Jamaican store. After he got the deposit slips and the $500, Wallace contacted Capri and demanded immediate payment of all of the remaining amount assertedly owed ($65,000) immediately. Wallace then reduced his demand to $5,000 by 5:00 p.m. that same day.

The following Monday morning, August 24, 1992, Wallace and his associates stole Capri's truck. At approximately 12:30 p.m., Wallace again spoke to Capri on the telephone. In the same breath, Wallace demanded money and warned Capri that he knew "where Capri's house is in Staten Island." When Capri explained that he had obtained $20,000, Wallace demanded more. Moreover, Wallace demanded payment immediately. Capri insisted that he only had $20,000, and told Wallace that he could not meet Wallace until 5:30 p.m. Wallace also instructed his associate, Joseph Cox, to threaten Capri. Thus, Cox told Capri he was a "dead man walking." Wallace returned to the telephone and complained that Capri had had his money for three and a half weeks, and that Capri had not contacted him over the weekend. Finally, Capri and Wallace (through Dwayne Register, another associate)

agreed to meet at the Blue Moon Cafe at 5:30 p.m. that day.

At the Blue Moon Cafe, the undercover FBI agent handed Cox a bag containing $21,000. When Cox told Capri that he and Wallace expected the rest of the money, the undercover agent told Cox that they would have the balance by Friday. Cox then threatened Capri and the undercover agent * * *.

## DISCUSSION

### A. The Count Charging Conspiracy to Defraud

■ Defendant's challenge to his conviction on the conspiracy count is grounded on the following provision of the Fifth Amendment:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.

Ever since Justice Black's opinion in *Stirone v. United States* (1960) 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252, it has been settled that the critical question posed by a defendant's invocation of this constitutional provision is whether or not it can be said with confidence that the grand jury was aware of—and intended to indict for—the particular crime for which the petit jury convicted. *See, e.g., United States v. Roshko* (2nd Cir. 1992) 969 F.2d 1, 5; *United States v. Zingaro* (2nd Cir.1988) 858 F.2d 94, 98; *United States v. Gonzalez* (5th Cir.1981) 661 F.2d 488, 492. It is also settled that once such a question has been answered in the negative, the defendant need not show prejudice in order to invoke constitutional protection. *See, e.g., Roshko,* 969 F.2d at 6; *Zingaro,* 858 F.2d at 98.

By no stretch of the imagination could anyone be confident that the grand jury was aware of the theory the Government pursued at trial, or that—if it had been—it intended to indict on that theory. As above noted, the relevant count identifies the object of the alleged conspiracy as being that "JEROME WALLACE * * * and others known and unknown, would and did execute and attempt to execute a scheme and artifice to defraud a

financial institution, to wit, Citibank, * * * in that the defendant would and did deposit illegitimate checks drawn on New Jersey banks and wrongfully receive payment on the checks." This language makes clear that the grand jury was presented with the theory that the defendant or one of his co-conspirators had intended to deposit checks with Citibank. The evidence presented by the Government at trial, however, was to the effect that the defendant, mistakenly believing that certain checks had been deposited in Citibank by someone outside the conspiracy, knowingly and willfully sought to defraud the bank by causing that person to withdraw the proceeds of those checks; and that neither the defendant nor any of his coconspirators had even the slightest intention of depositing a check with Citibank.

The portion of its "Reply Memorandum of Law" dealing with the count charging conspiracy to defraud highlights the untenable nature of the Government's position. It advances its argument under four headings. The first two of these address the constitutional question with which we are here concerned. The other two consider whether or not the defendant might have been prejudiced by any impermissible "variance" between the indictment and the proof. As we have seen, this second consideration is irrelevant to our present inquiry.

Turning to the government's relevant arguments, it first contends that the indictment language we have quoted "does not represent an essential element of the offense." This argument is rendered meaningless by the Government's inability to suggest any other language which does identify such an "essential element." The Government next argues that the quoted language does not charge defendant with conspiring "actually" to deposit checks at Citibank. A difficulty with this argument is that it necessarily assumes that neither the grand jury's Foreperson nor the United States Attorney, who respectively signed the indictment, were conversant with ordinary usages of the English language. We decline to make that assumption; and the count charging conspiracy to defraud must be dismissed.

## B. The Loansharking Counts

■ Turning to the loansharking counts, the statute in question, 18 U.S.C. § 894(a) (West 1994), provides:

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

The statute defines "extension of credit" in two ways, 18 U.S.C. § 891 (West 1994) (emphasis supplied):

To extend credit means to make or renew any loan, OR to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

There being no contention that a loan was ever made or renewed, the only question before us is whether or not the Government has established the alternative basis for conviction, namely an agreement, tacit or express, to defer repayment of a debt or claim. We are aware of some out-of-circuit cases which appear to have rewritten the statute so as to eliminate any requirement of an agreement, thereby converting every common law extortion into a federal loansharking offense except in the highly unusual situation where the extortioner pounces upon the victim at a moment when the latter happens to have on his or her person the exact amount of money demanded and is therefore able immediately to hand it over. See, for example, United States v. DiPasquale (3rd Cir.1984) 740 F.2d 1282, 1287, cert. denied (1985) 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364, upon which the Government heavily relies. (See Government's original memorandum at 29–31).

The Second Circuit has not so amended the statute. We have examined all Second Circuit opinions affirming convictions under the above-quoted sections and find that all but four of them dealt with the making or renewing of an actual loan, and therefore

have no bearing on the extension of credit problem with which we are here concerned.[3] The four exceptions are: *United States v. Mase* (2nd Cir.1977) 556 F.2d 671, *cert. denied* (1978) 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508; *United States v. Bufalino* (2nd Cir.) 576 F.2d 446, *cert. denied* (1978) 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321; *United States v. Kiszewski* (2nd Cir.1989) 877 F.2d 210; and *United States v. Lanese* (2nd Cir.1989) 890 F.2d 1284, *cert. denied* (1990) 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533. Those opinions, in turn, cite with approval three out-of-circuit decisions: *United States v. Briola* (10th Cir.1972) 465 F.2d 1018, *cert. denied* (1973) 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688; *United States v. Keresty* (3rd Cir.) 465 F.2d 36, *cert. denied* (1972) 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258; and *United States v. Annerino* (7th Cir.1974) 495 F.2d 1159. Accordingly, Second Circuit law here relevant can be determined by examination of these seven opinions.

Such an examination discloses that in every one of them there was evidence before the jury making it possible for it to find that the extortioner had entered into an implicit or explicit agreement to defer for some significant period of time repayment of a debt or claim. Three of the Second Circuit cases, *Mase, Kiszewski* and *Lanese,* dealt with bets placed with a bookmaker. When a gambler places a bet with a bookmaker, each of them necessarily relies on the credit of the other. The gambler relies upon the bookmaker's implied promise to pay him off if he wins. The bookmaker, on the other hand, relies on

the gambler's implied promise to put up the stake if he should lose. In *Mase,* the Circuit specifically recognized this situation and found that it enabled a jury to conclude that the defendant had entered into the necessary agreement to defer repayment (556 F.2d at 674). In both *Lanese* and *Kiszewski,* the evidence was similar to that in *Mase,* but the Circuit never discussed whether or not an agreement to defer had been established, because neither of the appellants had raised the question. *See Lanese,* 890 F.2d at 1288; *Kiszewski,* 877 F.2d at 212.

In *Bufalino,* the original claim arose out of the embezzlement of diamonds one of the defendants, a jeweler, had given "in exchange for a series of promises and a worthless check." (576 F.2d at 448). The Circuit accepted, *arguendo,* the argument that no extension of credit could be found from this original transaction. However, it took note of two taped conversations, during one of which Bufalino was recorded as "cursing Napoli [the embezzler] and threatening that 'I'm going to kill you'"; and in the other, the defrauded jeweler told the embezzler that "if he 'showed ... good faith, they're not gonna kill you.'" (*Id.*) This later assertion obviously could be construed as an implied assurance that Napoli would have a reasonable time to come up with some money before any killing would occur; and the Circuit found this and "related aspects of the record" sufficient to support the verdict (*id.*).

As to the out-of-circuit cases, *Briola* involved gambling debts and the Court made a ruling similar to the one in *Mase. Keresty*

**3.** The cases affirming convictions based on the making or renewing of a loan or loans are: *United States v. Persico* (2nd Cir.1988) 853 F.2d 134; *United States v. Persico* (2nd Cir.1987) 832 F.2d 705, *cert. denied* (1988) 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227; *United States v. Pacione, Jr.* (2nd Cir.1984) 738 F.2d 567; *United States v. Jacobson* (2nd Cir.1982) 691 F.2d 110; *United States v. Ochs* (2nd Cir.) 595 F.2d 1247, *cert. denied* (1979) 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328; *United States v. Gambino* (2nd Cir.1977) 566 F.2d 414, *cert. denied* (1978) 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802; *United States v. Sears* (2nd Cir.1976) 544 F.2d 585; *United States v. Natale* (2nd Cir.1975) 526 F.2d 1160, *cert. denied* (1976) 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193; *United States v. Mari* (2nd Cir.1975) 526 F.2d 117, *cert. denied* (1976) 429

U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311; *United States v. Frazier* (2nd Cir.1973) 479 F.2d 983; *United States v. Zito* (2nd Cir.1972) 467 F.2d 1401; *United States v. Smith* (2nd Cir.) 464 F.2d 1129, *cert. denied* (1972) 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314; *United States v. Palmieri* (2nd Cir.) 456 F.2d 9, *cert. denied* (1972) 406 U.S. 945, 92 S.Ct. 2054, 32 L.Ed.2d 332; *United States v. DeLutro* (2nd Cir.1970) 435 F.2d 255, *cert. denied* (1971) 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148; *United States v. DeStafano* (2nd Cir.1970) 429 F.2d 344, *cert. denied* (1971) 402 U.S. 972, 91 S.Ct. 1656, 29 L.Ed.2d 136; *United States v. Perez* (2nd Cir.1970) 426 F.2d 1073, *aff'd* (1971) 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686. *See also United States v. Zingaro* (2nd Cir.1988) 858 F.2d 94; *United States v. Curcio* (2nd Cir.1983) 712 F.2d 1532.

involved a debt incurred in the course of a crap game and the Government contended that each rolling of the dice had established an extension of credit. However, the Court found it unnecessary to pass on this contention because it concluded that the evidence justified a finding that the defendant had entered into an agreement (similar to the one in *Bufalino* ) to defer repayment for a period of time sufficient to allow the debtor to raise funds with which to make payment. Thus, it noted: "Capo [the debtor] again stated that he was unable to settle the debt without additional time and the debt was deferred to allow Capo sufficient time to raise the money" (465 F.2d at 39). Finally, the *Annerino* Court specifically noted that one of the extortioners had told their debtor to bring funds representing a portion of the debt to a future meeting at which time "they would determine the exact amount of the balance owing and the method of payment" (495 F.2d at 1166).

In brief, there is nothing in any case either decided or cited by the Second Circuit to suggest that it is about to amend the statute by eliminating the necessity of establishing an agreement.

■ We now turn to the situation before us. As above noted, the relevant part of the indictment starts with the allegation that "defendants and their co-conspirators would and did *sell* illegitimate checks to a cooperating witness ("CW") *on a credit basis,*" i.e., that they had intended to pass title to the checks they gave for collection. This allegation is patently absurd, and is not mentioned by the Government in either of the memoranda submitted in opposition to the instant motion. Indeed, in its original memorandum the Government repudiates the suggestion of a sale on a credit basis by asserting that it had "established that Wallace [the defendant] had obtained a number of stolen checks, approximately ten of which he *gave* to Carl Corso to cash" (*supra* at 4, emphasis supplied). The balance of the indictment's relevant language—"and then used and explicitly and implicitly threatened to use violence and other criminal means to cause harm to the CW's person, property and reputation, to collect money for the checks"—in no way suggests the entry into any agreement to defer repayment.

Turning to the facts actually adduced at trial, accepting for present purposes the Government's version of the relevant evidence (see *supra,* at 845–46), it is apparent that the evidence faithfully follows the just quoted language of the indictment, and similarly fails to suggest the entry into any agreement. The evidence, as interpreted by the Government, established that the defendant and his coconspirators by making wild threats and inflicting actual damage (i.e., the theft of two trucks) kept constant pressure— without even a moment's respite—upon the cooperating witness.

To summarize: it having been neither alleged nor proved that any agreement was entered into whereby the repayment or satisfaction of a debt or claim might have been or would be deferred, the loansharking counts must be dismissed.

### CONCLUSION

For the foregoing reasons, defendant's motion for a judgment notwithstanding the verdict is granted. Let the Government within ten days of this order submit a judgment on five days notice. In submitting such judgment the Government will not waive any objections to its substance. We make this direction that the Government submit the judgment so that we may be certain that its form will be consistent with our understanding that all rulings in this case will be fully reviewable by the Court of Appeals.

SO ORDERED.