59 F.3d 333
 UNITED STATES of America, Appellant-Cross-Appellee,
v.
Jerome WALLACE, Defendant-Appellee-Cross-Appellant,
Bruce Wallace and Dwayne Register, also known as Dwayne LNU,
Defendants.
 Nos. 1119, 1268, Dockets 94-1457, 94-1475.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1995.
Decided June 29, 1995.
 
 Celeste L. Koeleveld, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D. of N.Y., Paul G. Gardephe, Asst. U.S. Atty., New York City, on the brief) for appellant-cross-appellee.
 Lawrence K. Feitell, New York City, for defendant-appellee-cross-appellant.
 Before: McLAUGHLIN, JACOBS, Circuit Judges, and KAUFMAN, Senior District Judge.[1]
 JACOBS, Circuit Judge:
 
 
 1
 This is an appeal by the United States from a judgment entered by the United States District Court for the Southern District of New York (Knapp, J.), setting aside a jury verdict, convicting Jerome Wallace of conspiracy to commit bank fraud, pursuant to 18 U.S.C. Sec. 1344, and of conspiracy to use, and the use of, extortionate means to collect on an extension of credit, pursuant to 18 U.S.C. Sec. 894. The district court set aside the bank fraud conviction on the ground that the evidence at trial constituted a constructive amendment of the indictment. The district court set aside the loan-sharking convictions on the ground that there was no proof that there had been an extension of credit. The government asks us to reinstate the jury's verdict on each of the three counts. In his cross-appeal, Wallace seeks a modification of the portion of the district court's judgment allowing the government to seek a new indictment and permitting a second trial on charges relating to the bank fraud conspiracy.
 
 
 2
 We reverse the judgment insofar as it sets aside the bank fraud conspiracy conviction, but we affirm the setting aside of the loan-sharking convictions on the ground stated by the district court. Wallace's cross-appeal, which was premised on the assumption that the district court properly dismissed the bank fraud conspiracy count, is mooted by our reversal on that issue.BACKGROUND
 
 
 3
 On July 20, 1993, a federal grand jury issued an indictment naming defendants Jerome Wallace, his brother Bruce Wallace, and Dwayne Register in a bank fraud and extortion scheme. The defendants were charged as follows:
 
 
 4
 Count One: Conspiracy to defraud a federally insured bank in violation of 18 U.S.C. Sec. 1344.
 
 
 5
 Count Two: Attempt to defraud a federally insured bank in violation of 18 U.S.C. Sec. 1344.
 
 
 6
 Count Three: Conspiracy to use extortion to collect on an extension of credit in violation of 18 U.S.C. Secs. 891, 894.
 
 
 7
 Count Four: Use of extortion to collect on an extension of credit in violation of 18 U.S.C. Secs. 891, 894.
 
 
 8
 Register pleaded guilty to count one of the indictment in October 1993. The trial of the Wallace brothers began on January 6, 1994 and ended on January 25, 1994. The jury acquitted Bruce Wallace on all four counts of the indictment. Jerome Wallace (hereinafter "Wallace") was acquitted on count two, and convicted on counts one, three and four.
 
 
 9
 At trial, the government presented the testimony of Carl Corso and Joseph Cox, two co-conspirators who had entered guilty pleas prior to the filing of the indictment at issue. The government's remaining case consisted chiefly of secretly-made tape recordings, some stolen checks, and bank deposit slips. With all available inferences drawn in favor of the jury's verdict, the evidence established the following.
 
 
 10
 The bank fraud conspiracy. In the summer of 1992, Wallace came into possession of a quantity of stolen checks. He asked Carl Corso to negotiate approximately ten of these checks, offering him the following instructions:
 
 
 11
 You open up an account and you take these checks, you double endorse them and you deposit them into this account. And then when the check clears, within two or three days, you take the money out of the account and you never go back to the account, and you have the money.
 
 
 12
 Appendix ("A") at 317. Corso enlisted two friends, and arranged for each of them to cash two of the stolen checks, using their bank accounts. The scheme worked and the proceeds were split among Corso and the Wallace brothers and their two friends.
 
 
 13
 On August 6, 1992, Corso and his father, John Corso, asked Vinny Capri to negotiate the remaining six checks, totaling $70,570. Capri, however, was a confidential informant for the FBI. Under directions from the FBI, Capri agreed to cash the checks for the Corsos in exchange for a one-third share of the profits. The FBI borrowed a stamp from a federally-insured bank, picking Citibank, and furnished Capri with a stamped receipt reflecting a non-existent deposit of the checks at Citibank. On August 17, 1992, Capri showed Corso the phony deposit slip, and told him that the six stolen checks had been deposited at a New York City branch of Citibank. Over the following week, Wallace and Corso repeatedly demanded that Capri withdraw the proceeds and hand the money over to them. On August 24, Corso and Joseph Cox met with Capri to pick up a partial payment of $21,000. The two were arrested immediately after accepting this money.
 
 
 14
 The Extortionate Collection of Credit. Between August 17 and August 24, Wallace's demands for payment from Capri were accompanied by threats. At one point, Wallace stole Capri's truck. On each occasion, Capri was approached by Wallace or by one of his representatives, Capri promised he would get the money, and no physical harm was inflicted. For example, on August 21, Wallace, accompanied by Cox, appeared at Capri's office demanding payment. Cox described the incident at trial:
 
 
 15
 Cox: The first thing Jerome [Wallace] said was where is my money?
 
 
 16
 Vinny [Capri] says, "I don't have your money right now."
 
 
 17
 "Where is my fucking money, Vinny?"
 
 
 18
 So he proceeded to tell Vinny, you don't know who you are playing with, you know. I will put your ass in a soup can. You don't know who you are fucking with; do you? Where is my money, Vinny? I want my money.
 
 
 19
 Prosecutor: What did Vinny say?
 
 
 20
 Cox: Vinny say, "You'll have your money, you know, I'll have some money for you later on." Something to that effect.
 
 
 21
 A. at 673-74. Thus money was demanded immediately, harm was threatened, a promise of future payment was received, and the extorter left. The government relies on this and similar exchanges as evidence of Wallace's extension of credit to Capri.
 
 
 22
 The Jury Instructions. As filed, count one of the indictment alleged that it "was an object of the conspiracy" that the defendants and their co-conspirators
 
 
 23
 would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, to wit, Citibank, located at 107 William Street, New York, New York, in that the defendants would and did deposit illegitimate checks drawn on New Jersey banks and wrongfully receive payment on the checks, in violation of Section 1344 of Title 18, United States Code.
 
 
 24
 A. at ix-x. Judge Knapp expressed skepticism throughout the trial as to whether the government was presenting any evidence that Wallace or the other defendants had deposited or intended to deposit any stolen checks at Citibank. Capri, the government informant, never actually deposited the stolen checks anywhere.[2] The FBI borrowed from Citibank the stamping device that was used to prepare the false deposit slip Capri displayed to Corso, but Citibank was otherwise unrelated to any of these transactions. The jury instructions, reflecting these circumstances, omitted all reference to the indictment's allegation that "the defendants would and did deposit illegitimate checks" at Citibank. The object of the conspiracy described in the charge was "to defraud Citibank by obtaining from it money resulting from the deposit of checks whose endorsements had been forged." A. at 1121.
 
 
 25
 After the jury returned its verdict finding Wallace guilty on counts one, three and four, the district court solicited briefs from the parties concerning the validity of the convictions. In United States v. Wallace, 856 F.Supp. 843 (S.D.N.Y.1994), the district court (1) set aside the bank fraud conspiracy conviction (count one) because the court could find no substantial relationship between the indictment and the proof actually offered at trial, and (2) set aside the extortion convictions (counts three and four) on a finding that the evidence presented at trial was insufficient, as a matter of law, to evidence an extension of credit under 18 U.S.C. Secs. 891, 894. The district court's final order recited that its dismissal of count one of the indictment was "without prejudice ... to a new trial with respect to the facts litigated under that count, should a grand jury return an appropriate indictment."[3] A. 1320. This appeal followed.
 
 DISCUSSION
 
 26
 A. The Bank Fraud Conspiracy.
 
 
 27
 The district court concluded that the crimes alleged in count one of the indictment were not the crimes that the government proved at trial: "By no stretch of the imagination could anyone be confident that the grand jury was aware of the theory the Government pursued at trial, or that--if it had been--it intended to indict on that theory." 856 F.Supp. at 846. This ruling is strictly one of law and, as such, is reviewed de novo. See United States v. Robison, 904 F.2d 365, 368 (6th Cir.), cert. denied, 498 U.S. 946, 111 S.Ct. 360, 112 L.Ed.2d 323 (1990).
 
 
 28
 The Fifth Amendment mandates that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." A "substantial deviation of [jury] instructions from an indictment is impermissible because first it requires a defendant to answer a criminal charge that was not brought by a grand jury, ... and second it denies the defendant sufficient notice to prepare and present an adequate defense." United States v. Lemire, 720 F.2d 1327, 1344 (D.C.Cir.1983) (citations omitted), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).
 
 
 29
 On appeal, the government argues that, although the jury charge on which the defendant was convicted differed from the wording of the indictment, the difference amounts to a permissible narrowing of the indictment rather than an impermissible deviation. Count one of the indictment charged defendants with "execut[ing] and attempt[ing] to execute a scheme and artifice to defraud a financial institution, to wit, Citibank ... in that the defendants would and did deposit illegitimate checks ... and wrongfully receive payment on the checks." The government concedes that it offered no proof that "the defendants would and did deposit illegitimate checks," but contends that there was ample proof that the defendants did "attempt to execute a scheme and artifice to defraud a financial institution, to wit, Citibank ... in that the defendants would and did ... wrongfully receive payment on the checks."
 
 
 30
 On appeal Wallace argues that the differences between allegation and proof amount to a constructive amendment or a prejudicial variance.
 
 
 31
 1. Constructive Amendment. Constructive amendment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Mollica, 849 F.2d 723, 729 (2d Cir.1988) (citing Stirone v. United States, 361 U.S. 212, 219, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960)). In such cases, the amendment results in the defendant being "convicted on a charge the grand jury never made against him." United States v. Morgenstern, 933 F.2d 1108, 1115 (2d Cir.1991) (citations and quotations omitted), cert. denied, 502 U.S. 1101, 112 S.Ct. 1188, 117 L.Ed.2d 430; see also United States v. Khan, 53 F.3d 507, 517 (2d Cir.1995). Such an amendment is "per se prejudicial, as it directly violates the grand jury clause of the Fifth Amendment." Morgenstern, 933 F.2d at 1115; United States v. Delano, 55 F.3d 720, 729 (2d Cir.1995).
 
 
 32
 Not all modifications constitute constructive amendments, however: "[W]here charges are 'constructively narrowed' or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, no constructive amendment occurs." Morgenstern, 933 F.2d at 1115. That is because "narrowing the scope of an indictment ... by redaction[ ] does not offend the notice and review functions served by a grand jury's issuance of an indictment." United States v. Smith, 918 F.2d 1032, 1036 (2d Cir.1990), cert. denied, 498 U.S. 1125, 111 S.Ct. 1086, 112 L.Ed.2d 1191 (1991). "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." United States v. Miller, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985).
 
 
 33
 Miller, a mail fraud case, illustrates a permissible narrowing of an indictment. The disputed count charged the use of the mails to commit various fraudulent acts in connection with a burglary at the defendant's place of business. Id. at 131, 105 S.Ct. at 1812-13. The indictment alleged that Miller had both consented to the burglary in advance and that he had lied to the insurer about the magnitude of the loss. Id. at 132, 105 S.Ct. at 1813. The proof presented at trial, however, concerned only the misrepresentation to the insurance company. Id. The jury was charged on the entire indictment and returned a guilty verdict. Id. at 133-34, 105 S.Ct. at 1813-14. The Supreme Court affirmed Miller's conviction (reversing the Fifth Circuit) on the ground that "[t]he facts proved at trial clearly conformed to one of the theories of the offense contained within that indictment ..." Id. at 134, 105 S.Ct. at 1814.
 
 
 34
 In Wallace's indictment, count one charged a conspiracy having two wrongful objectives: to deposit of the checks and to receive the proceeds of them. It is undisputed on appeal that the evidence presented at trial did not show that the defendants conspired to deposit illegitimate checks at Citibank. However, the evidence does establish that Wallace was shown the stamped Citibank receipt, which reflected the deposit of the stolen checks at that bank, and that he thereafter took steps to induce Capri to withdraw the proceeds of the stolen checks from Citibank so that the conspirators could divide the proceeds. The indictment can be parsed in a way that would cast Wallace's conduct in terms of the elements of bank fraud: it "was an object of the conspiracy" that the defendants and their co-conspirators
 
 
 35
 did ... attempt to execute a scheme and artifice to defraud a financial institution, to wit, Citibank, located at 107 Williams Street, New York, New York, in that the defendants would ... wrongfully receive payment on [illegitimate] checks, in violation of Section 1344 of title 18, United States Code.
 
 
 36
 Although Citibank was not targeted by the conspirators in their original plan, Wallace was shown the deposit slip bearing the Citibank stamp. Cf. United States v. Knecht, 55 F.3d 54, 55-57 (2d Cir.1995). Thereafter, when he pressured Capri to draw the funds shown on the deposit slip, he was conspiring in an "attempt" to "wrongfully receive payment" from Citibank. In short, the prosecution's case and the jury charge narrowed the indictment but did not constructively amend it.
 
 
 37
 2. Variance. Even where there is evidence to support an offense pleaded in the indictment, the error of variance may arise if the evidence actually presented by the government at trial impermissibly shifts the government's theory of proof. "[A] variance occurs when the charging terms are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Helmsley, 941 F.2d 71, 89 (2d Cir.1991), cert. denied, 502 U.S. 1091, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992).
 
 
 38
 To detect variance, we ask whether "the defendant was given notice of the 'core of criminality' to be proven at trial." United States v. Heimann, 705 F.2d 662, 666 (2d Cir.1983), (citing United States v. Sindona, 636 F.2d 792, 797-98 (2d Cir.1980), cert. denied, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981)). Because "[a] variance ... does not broaden the possible basis for conviction beyond that contained in the indictment," United States v. Patino, 962 F.2d 263, 266 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 354, 121 L.Ed.2d 268 (1992), it will furnish the ground for overturning a verdict only if the defendant first shows that the variance "result[ed] in substantial prejudice". United States v. McDermott, 918 F.2d 319, 326 (2d Cir.1990) (emphasis added), cert. denied, 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991). Assuming, arguendo, that the proof presented at trial differed from the evidence augured in the indictment, Wallace has failed to demonstrate prejudice, because the indictment did not mislead Wallace as to the acts and events that were the subject of the trial.
 
 
 39
 The district court's judgment setting aside count one is vacated and the case is remanded for sentencing on this count.
 
 
 40
 B. The Extortionate Extension of Credit.
 
 
 41
 We review de novo a district court's finding that the evidence presented at trial was ultimately insufficient to support a jury's verdict. United States v. Hamilton, 978 F.2d 783, 785-86 (2d Cir.1992). In general, when reviewing a conviction for sufficiency of evidence, all available inferences and all issues of credibility are viewed in favor of the jury's verdict. United States v. Teitler, 802 F.2d 606, 614 (2d Cir.1986). A defendant who bases an appeal on insufficiency of the evidence bears a "very heavy burden." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992).
 
 
 42
 The district court's judgment dismissing this claim rests upon the language of 18 U.S.C. Sec. 894:
 
 
 43
 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 
 
 44
 (1) to collect or attempt to collect any extension of credit, or
 
 
 45
 (2) to punish any person for the nonrepayment thereof,shall be fined ... or imprisoned not more than 20 years, or both.
 
 
 46
 (Emphasis added.) The "extension of credit" is a defined term:
 
 
 47
 To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.
 
 
 48
 18 U.S.C. Sec. 891(1). These provisions were directed primarily at persons engaged in loan-sharking and organized crime, see Perez v. United States, 402 U.S. 146, 147, 91 S.Ct. 1357, 1358, 28 L.Ed.2d 686 (1971), though they are not specifically limited to such situations. See United States v. Bufalino, 576 F.2d 446, 452 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). We have acknowledged that the statute is a broad one, "reflect[ing] Congress's desire to craft a flexible set of tools for prosecutors to wield with 'vigor and imagination'...." United States v. Scotti, 47 F.3d 1237, 1244 (2d Cir.1995) (citing H.R.Conf.Rep. No. 1397, 90th Cong., 2d Sess. 31, reprinted in 1968 U.S.C.C.A.N. 2021, 2029).
 
 
 49
 There is no doubt that the government presented evidence that would have supported a finding that the defendant used "extortionate means" in an attempt to collect money from Capri. However, we agree with the district court that these extortionate means were not used to collect on "any extension of credit" that fits the definition prescribed in Sec. 891. Since the evidence cannot be viewed to show a "loan" between Wallace and Capri, the government argues that Wallace and Capri had (in the words of the statute) "enter[ed] into [an] agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, [was] deferred." 18 U.S.C. Sec. 891. According to the government, such an extension of credit was made, because (in the words of the indictment) "defendants and their co-conspirators would and did sell illegitimate checks to a cooperating witness ... on a credit basis."
 
 
 50
 However, there was no evidence of a "sale" on "credit." The closest commercial analog to the check transaction is a consignment in which the obligation to pay is contingent and no title passes. There was no indication that Capri would pay Wallace for the checks if the scheme to defraud the bank had failed. The parties merely agreed to split the proceeds of a transaction if the transaction succeeded.
 
 
 51
 Although Wallace demanded payment of the money after the scheme appeared to succeed, we agree with the district court that none of the evidence presented at trial amounted to the formation of a credit agreement, because Wallace and his representatives never "agree[d]" to "defer[ ]" the collection of their money. After making their threats, they merely (and temporarily) left Capri intact. As Judge Knapp observed, forcing these facts to fit into the words of the statute would tend to "convert[ ] every common law extortion into a federal loansharking offense ..." 856 F.Supp. at 847.[4]
 
 
 52
 The government relies on Bufalino, 576 F.2d 446, to support its reading of Secs. 894 and 891. In that case, a jeweler engaged Bufalino to collect by threats $25,000 due on the sale of some diamonds. Id. at 448. Defendants argued on appeal that, under Secs. 894 and 891, the jeweler had "extended no credit" to the purchaser, who had obtained the diamonds "through deceit and never had any intention of paying for them." Id. at 452. We rejected this argument, emphasizing that Congress has taken an "exceedingly broad view of what it is 'to extend credit' ". Id. (emphasis added). The government now argues that, as in Bufalino, Wallace had a "tacit" agreement to extend credit to Capri.
 
 
 53
 Bufalino differs from this case precisely because credit was extended in Bufalino :
 
 
 54
 [A] singularly credulous New York jeweler named Herbert Jacobs entered into a number of transactions with one Jack Napoli wherein some $25,000 worth of diamonds were transferred to Napoli in exchange for a series of promises and a worthless check. Some of Napoli's success derived from repeated unauthorized invocations of the name of Russell Bufalino, who evidently constituted an impressive credit reference with Jacobs.
 
 
 55
 Bufalino, 576 F.2d at 448 (emphasis added). Part of the consideration accepted by Jacobs was "a series of promises". Napoli's promises evidently included assurances of future payments, because Jacobs required some assurance of creditworthiness. Thus Napoli used Bufalino's reputation and prestige as a "credit reference". On the strength of these assurances, Jacobs extended credit to Napoli long before the extortionate collection methods were employed.
 
 
 56
 We conclude that no act committed by Wallace constituted an agreement to extend credit. Wallace engaged in extortionate conduct, but Wallace never "enter[ed] into an agreement" to delay or forbear on any terms. As the district court found, the evidence established no more than that "the defendant and his coconspirators by making wild threats and inflicting actual damage ... kept constant pressure--without a moment's respite--upon the cooperating witness." 856 F.Supp. at 849. Although Wallace several times tolerated a delay in payment, this impatient forbearance was no more than a reprieve on his extortionate threats to injure Capri, or turn him into condensed soup, unless immediate payment was made. We could not accept the government's position without deleting the "extension of credit" element of Sec. 894 and the "agreement" requirement of Sec. 891. We affirm the district court's decision to set aside the jury's verdict on counts three and four of the indictment.
 
 CONCLUSION
 
 57
 In summary, the judgment of acquittal entered by the district court on count one of the indictment is reversed, the jury's verdict on that count is reinstated, and we remand for sentencing. In all other respects, we affirm.
 
 
 58
 KAUFMAN, Senior District Judge, concurring in part and dissenting in part:
 
 
 59
 I fully concur with Judge Jacobs' majority opinion in all respects, except with regard to extension of credit. In that latter regard, I disagree with the majority's view that the district court correctly set aside the loan-sharking convictions. The district court so did because, in its view, there was a lack of proof of extension of credit. The majority opinion of this appellate panel specifically notes "Congress's desire to craft a flexible set of tools for prosecutors to wield with 'vigor and imagination' ..." United States v. Scotti, 47 F.3d 1237, 1244 (2d Cir.1995) (citing H.R.Conf.Rep. No. 1397, 90th Cong., 2d Sess. 31, reprinted in 1968 U.S.C.C.A.N. 2021, 2029). However, the majority proceeds to conclude that "no act committed by Wallace constituted an agreement to extend credit [because while] Wallace engaged in extortionate conduct ... Wallace never 'enter[ed] into an agreement' to delay or forebear on any terms." The majority cites to United States v. Boulahanis, 677 F.2d 586, 590 (7th Cir.), cert. denied 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), and also notes, on a "but see" basis, United States v. DiPasquale, 740 F.2d 1282, 1287-88 (3d Cir.1984), cert. denied 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985). See note 4 in the majority opinion.
 
 
 60
 The majority also discusses Judge Feinberg's opinion in United States v. Bufalino, 576 F.2d 446 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). I agree with the majority that Bufalino does not require us to hold that there was, in the within case, any extension of credit, whether tacit or otherwise, pursuant to 18 U.S.C. Sec. 894 and Sec. 891, but there is also no suggestion in Bufalino that Congress intended anything other than a "broad" application of the definition of "extension of credit." Indeed, what Judge Feinberg has written in Bufalino affirmatively suggests such a broad view. In Bufalino --and in Boulahanis and in DiPasquale --there was a lack of an "express" agreement to defer the repayment or satisfaction of a debt or claim. In all three of those cases, there was evidence of extortion and of implied short extensions of time for the alleged debtor to make payment to the alleged creditor. In Bufalino and in DiPasquale, this Court and the Third Circuit, respectively, seemingly concluded that a tacit agreement to defer was present. In DiPasquale, the Third Circuit, after noting at 1287 that its position was in line with that taken by the Sixth and Ninth Circuits and perhaps with some reservation, also by the Fourth Circuit, wrote:
 
 
 61
 Only the Boulahanis court has constrained the scope of chapter 42 [in which section 894 and section 891, the definitional section, are included]. We decline to follow Boulahanis because we believe that its construction is inconsistent with the language and purpose of chapter 42.
 
 DiPasquale, 740 F.2d at 1288.[1]
 
 62
 In the end, in my view, the question posed in Bufalino, Boulahanis and DiPasquale, and in the within case, is essentially one of fact. In Boulahanis, 677 F.2d at 591, Judge Posner wrote that "we do not think the government met its burden of proof beyond a reasonable doubt." In DiPasquale, 740 F.2d at 1288, Judge Seitz wrote: "[w]e conclude that a claimed debt is one type of extension of credit under section 891(1). The indictment was therefore sufficient under 18 U.S.C. Sec. 894(a)." Judge Posner was of the opinion that the Government's proof in Boulahanis was not sufficient to sustain proof beyond a reasonable doubt, even of a tacit agreement to extend. Judge Seitz held, in effect, in DiPasquale that the indictment sufficiently alleged a tacit agreement. In all three cases, Boulahanis, DiPasquale and Bufalino --and in the within case--the specific inquiry, I believe, is whether the trier of fact should have been permitted to find beyond a reasonable doubt the fact of the existence of a tacit agreement to extend credit. The majority in this case says "No", as did Judge Posner in Boulahanis. Respectfully, I come to the opposite conclusion in this case and say "Yes," as did Judge Feinberg in Bufalino and Judge Seitz in DiPasquale.[2] Accordingly, as to the "extension of credit" issue, I dissent and would remand to the district court with instructions to reinstate the jury verdicts in connection with the counts of the indictment pertaining to that single issue; otherwise, however, I join the majority.
 
 
 
 [1]
 Honorable Frank A. Kaufman, of the United States District Court for the District of Maryland, sitting by designation
 
 
 [2]
 The transactions involving the first four checks (the checks that did not involve Capri) concerned a New Jersey Bank. These transactions are apparently not covered by the indictment
 
 
 [3]
 The defendant's cross-appeal pertains solely to this issue. As noted above, because we reverse the district court's decision to set aside the jury verdict on count one of the indictment, we need not reach the merits of the cross-appeal
 
 
 [4]
 The Seventh Circuit has adopted a view of the statute similar to that taken by the district court. In United States v. Boulahanis, 677 F.2d 586, 590 (7th Cir.), cert. denied, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), the Seventh Circuit found that the statute requires a "deliberate act" by a creditor before an agreement to extend credit may be found. But see United States v. DiPasquale, 740 F.2d 1282, 1287-88 (3d Cir.1984), cert. denied, 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985)
 
 
 [1]
 In that regard, see U.S. v. Goode, 945 F.2d 1168, 1170 (10th Cir.1991) (noting the lack of agreement between DiPasquale and Boulahanis ). But see U.S. v. Stokes, 944 F.2d 211, 214 n. 1 and 215 (5th Cir.1991) (opting for the Boulahanis Court's interpretation of section 894). Several courts have distinguished Boulahanis without expressing disagreement with it, see U.S. v. Polizzi, 801 F.2d 1543, 1556-57 (9th Cir.1986); U.S. v. McMahan 744 F.2d 647, 650 (8th Cir.1984); U.S. v. Brinkman, 739 F.2d 977, 983 n. 5 (4th Cir.1984)
 
 
 [2]
 For broad readings of Sec. 894(a), see also U.S. v. Stauffer, 922 F.2d 508, 512-13 (9th Cir.1990); U.S. v. Brinkman, 739 F.2d 977, 982-83 (4th Cir.1984); U.S. v. Sedlak, 720 F.2d 715, 720-21 (1st Cir.1983), cert. denied, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984); U.S. v. Andrino, 501 F.2d 1373, 1376-78 (9th Cir.1974); U.S. v. Briola, 465 F.2d 1018, 1021-22 (10th Cir.1972), cert. denied, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973). Sedlak and Andrino were decided before DiPasquale, but not cited to therein